Richard BARNETT, Timuel Black, Rosemary Oliver, Eddie Read, Georgia Trevan, Conrad Worrill, Chauncery Stroud, Leonard Owens and Eugene Ford, Plaintiffs,

v.

Richard M. DALEY, as Mayor of the City of Chicago, Ill., and as Chairman of the Chicago, Illinois City Council; and Theodore Mazola, Bobby L. Rush, Dorothy Tillman, Toni Preckwinkle, Lawrence Bloom, John O. Steele, William Beavers, Lorraine Dixon, Robert Shaw, John Buchanan, Patrick M. Huels, Mark J. Fary, John S. Madrzyk, Edward Burke, Virgil E. Jones, Shirley Coleman, Allan Streeter, Thomas Murphy, Ginger Rugai, Arenda Troutman, Jesse Evans, Jesus Garcia, James Laski, Jesse Miller Jr., Ambrosio Medrano, Luis Gutierrez, Rickey Hendon, Ed H. Smith, Sam Burrel, Carole Bialczak, Ray Suarez, Terry M. Gabinski, Richard F. Mell, Lemuel Austin Jr., Michael A. Wojcik, William J.P. Banks, Percy Z. Giles, Thomas W. Cullerton, Anthony C. Laurino, Patrick J. O'Connor, Brian Doherty, Burton F. Natarus, Edwin Eisendrath, Bernard J. Hansen, Patrick J. Levar, Helen Shiller, Eugene C. Schulter, Mary Ann Smith, Joseph A. Moore, Bernard L. Stone, as Alderpersons and as Members of the City Council of the City of Chicago, Illinois; and Michael J. Hamblet, Arnette Hubbard, and Chris Robling, as Members of the Chicago Illinois Board of Election, Defendants.

Ed H. SMITH, Allan Streeter, Helen Shiller, John O. Steele, Dorothy Tillman, Lawrence S. Bloom, Robert Shaw, Jesse J. Evans, Bobby L. Rush, Percy Giles, William M. Beavers, Toni Preckwinkle, Rickey Hendon, Joe Moore, Arenda Troutman, Shirley A. Coleman, Virgil E. Jones, Jesse Miller, Sam Burrell, and Political Action Conference of Illinois, Individually and on Behalf of all Others Similarly Situated, Plaintiffs,

v.

Richard M. DALEY, City Council of the City of Chicago, and Board of Election Commissioners of Chicago, Defendants,

and

Carole Bialczak, Thomas Murphy, Luis Gutierrez, Patrick M. Huels, James Laski, Anthony C. Laurino, Ginger Rugai, Patrick J. Levar, John S. Madrzyk, Theodore Mazola, Lemuel Austin, Jr., Edwin Eisendrath, Edward Burke, William J.P. Banks, Bernard L. Stone, Eugene C. Schulter, John Buchanan, Mary Ann Smith, Brian Doherty, Ambrosio Medrano, Lorraine L. Dixon, Theris M. Gabinski, Ray Suarez, Burton F. Natarus, Bernard J. Hansen, Richard F. Mell, Thomas W. Cullerton, Mark Fary, Patrick J. O'Connor, and Michael J. Wojcik, Defendant Intervenors.

No. 92 C 1683.

United States District Court,
N.D. Illinois, E.D.

Dec. 21, 1992.

for Theodore Mazola, Lorraine Dixon, John Buchanan, Patrick M. Huels, Mark J. Fary, John S. Madrzyk, Edward M. Burke, Thomas Murphy, Ginger Rugai, James J. Laski, Ambrosio Medrano, Luis Gutierrez, Carole Bialczak, Ray Suarez, Terry M. Gabinski, Richard F. Mell, Lemuel Austin, Jr., Michael A. Wojcik, William J.P. Banks, Percy Z. Giles, Thomas W. Cullerton, Anthony C. Laurino, Patrick J. O'Connor, Brian Doherty, Burton F. Natarus, Edwin Eisendrath, Bernard J. Hansen, Patrick J. Levar, Eugene C. Schulter, Mary Ann Smith and Bernard L. Stone.

Matthew J. Piers, Jonathan A. Rothstein, Vanessa Jean Weathersby, Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., Chicago, IL, for Jesus Garcia.

Michael Levinson, Board of Election Com'r., Chicago, IL, for Michael J. Hamblet, Arnette Hubbard and Chris Robling.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

In these consolidated cases, two separate groups of plaintiffs challenge the redistricting of Chicago's wards. In *Barnett*, a group of African–American, registered voters in the City of Chicago (the *"Barnett* Plaintiffs") allege that both the redistricting process and the resultant map are unconstitutional and violate the Voting Rights Act. In *Smith*, a group of African–American and Caucasian Chicago Aldermen, as well as the Political Action Conference of Illinois, a not-for-profit political action organization composed of African–American citizens and representatives residing in the City of Chicago (the *"Smith* Plaintiffs"), allege that the redistricted ward map violates the Voting Rights Act.[1] Both the *Smith* and *Barnett* Defendants have filed motions to dismiss which are currently

Nathaniel R. Howse, Howse & Howse, R. Eugene Pincham, Philander Scott Neville, Jr., Chicago, IL, for Richard Barnett, Tim Black, Rosemary Oliver, Leonard Owens and Eugene Ford.

Kelly Raymond Welsh, Susan R. Lichtenstein, Andrew S. Mine, City of Chicago, Law Dept., Corp. Counsel, Chicago, IL, for Richard M. Daley.

Joel T. Pelz, Jerold Sherwin Solovy, Barry Sullivan, Jenner & Block, Chicago, IL,

---

1. The *Smith* Plaintiffs and the *Barnett* Plaintiffs will occasionally be jointly referred to as the "Plaintiffs." Likewise, the defendants in both actions, including the defendant-intervenors in the *Smith* case, will occasionally be collectively referred to as the "Defendants."

# 1326

pending before the court.[2] For the reasons discussed below, the court grants both motions to dismiss.

## BACKGROUND

Illinois law required the Chicago City Council to redistrict Chicago's 50 wards by December 1, 1991, based upon the 1990 Census. Ill.Rev.Stat. ch. 24, ¶ 21–38. Since the City Council failed to do so, Illinois law provided that any ten Chicago aldermen could propose a redistricting ordinance and demand that it be put to a popular referendum. Ill.Rev.Stat. ch. 24, ¶ 21–40.

Two different redistricting ordinances were ultimately proposed and placed on the ballot. One of the ordinances was sponsored by the *Smith* Plaintiffs, while the other was offered by 28 aldermen supporting Mayor Richard Daley on this issue. On March 17, 1992, the map proposed by the latter group (hereinafter, the "March 1992 Map") was selected by the voters, and thereupon came into "force and effect." Ill.Rev.Stat. ch. 24, § 21–42.

Under the March 1992 Map, the racial composition of Chicago's 50 wards (according to total population) is as follows:[3]

| % of pop. in a given ward | # of wards in which **whites** constitute the given % | # of wards in which **blacks** constitute the given % | # of wards in which **Hispanics** constitute the given % |
|---|---|---|---|
| >35% | 24 | 20 | 10 |
| >40% | 24 | 20 | 8 |
| >45% | 22 | 20 | 7 |
| >50% | 18 | 20 | 7 |
| >55% | 18 | 20 | 7 |
| >60% | 13 | 19 | 7 |
| >65% | 12 | 19 | 7 |
| >70% | 12 | 19 | 3 |

Although the parties disagree on the precise number of wards controlled by each ethnic group, neither side contends that the city's wards are, or should be, perfectly distributed according to racial group population.[4] Indeed, as the Plaintiffs point out in their Joint Response, proportional representation would be virtually impossible in

Chicago due to the size and dispersion of Chicago's many ethnic groups.

The *Smith* Plaintiffs nevertheless allege that the March 1992 Map maximizes the political power of Caucasians by "fracturing" African–American communities (i.e., splitting them into more than one district with the result that African–Americans

2. *Bonilla v. The City Council of the City of Chicago*, 809 F.Supp. 590 also involves a challenge to the redistricting of Chicago's wards. Although both *Bonilla* and *Smith* were reassigned to this court on relatedness grounds, *Bonilla* (unlike *Smith*) has not been formally consolidated with *Barnett*. Accordingly, the pending motion to dismiss *Bonilla* is addressed in a separate opinion.

3. This table was created based upon 1990 Census data presented in the *Barnett* Amended Complaint and reiterated in Plaintiffs' Joint Response, as well as in Exhibit 5(A) to Plaintiffs' Joint Response. All exhibits other than Exhibit 5(A) are inappropriate in connection with a Rule 12(b)(6) Motion. However, because the

court does not want to convert Defendants' motions to dismiss into premature summary judgment motions, the court hereby excludes these other exhibits. Exhibit 5(A) is not excluded since it merely reiterates statistics presented in the pleadings and various response briefs. *See*, Charles Wright & Arthur Miller, 5A *Federal Practice and Procedure:* Civil 2d § 1366 (West Publishing, 2d ed. 1990).

4. In terms of over-all population city-wide, according to the 1990 Census, African–Americans constitute 38.6% of Chicago's population, Caucasians constitute 37.9%, Hispanics constitute 19.6%, and Asian–Americans and other minorities constitute 3.9%. (P.Jt.Response at 18).

constitute an ineffective political grouping in each) and drawing majority Caucasian wards that "borrow" population from other groups. Because of the alleged "fracturing", the *Smith* Plaintiffs assert that the March 1992 Map violates the Voting Rights Act.

The *Barnett* Plaintiffs, meanwhile, allege that the March 1992 Map "packs" African–Americans into super-majority wards (i.e., excessively concentrates them) without similarly packing Caucasians. Accordingly, the *Barnett* Plaintiffs allege that the March 1992 Map violates the Voting Rights Act, the Civil Rights Act, the 14th Amendment, and the 15th Amendment. The *Barnett* Plaintiffs also allege that the ballot used in the March 17, 1992 redistricting referendum was so ambiguous, illogical and uninformative as to be violative of the same constitutional and statutory provisions.

## DISCUSSION

■ The standard governing this court's decision on a Rule 12(b)(6) motion is well established. Only if the allegations in the complaint, and all reasonable inferences drawn therefrom, could not support any cause of action may this court grant the motion. See generally Charles Wright & Arthur Miller, 5A *Federal Practice and Procedure:* Civil 2d § 1357 (West Publishing, 2d ed. 1990). The court, however, need not strain to find inferences favorable to the Plaintiffs which are not apparent on the face of the complaint. *Coates v. Illinois State Board of Education,* 559 F.2d 445, 447 (7th Cir.1977). The court must nevertheless interpret ambiguities in the complaint in favor of the Plaintiffs, and the Plaintiffs are free, in defending against the motions, "to allege without evidentiary support any facts [they] please[ ] that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved ... would entitle [them] to judgment." *Early v. Bankers Life and Casualty Co.,* 959 F.2d 75, 79 (7th Cir.1992).

### A. The *Smith* and *Barnett* Claims that the March 1992 Map Violates the Voting Rights Act.

Section 2(a) of the Voting Rights Act makes it illegal to deny or abridge, on account of race, any person's right to vote. 42 U.S.C. § 1973(a). Section 2(b), as amended in 1982, adds that a violation of § 2(a) occurs

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election ... are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b) (emphasis in original). Congress amended § 2 in 1982 so as to define Voting Rights Act violations in terms of discriminatory outcome, not intent. *Thornburg v. Gingles,* 478 U.S. 30, 35, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986). As a result, § 2 violations can be proven "by showing discriminatory effect alone", rather than having to show a discriminatory purpose. *Id.* at 35, 106 S.Ct. at 2758.

■ At the same time, however, § 2(b) says that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). This proviso unequivocally disclaims a right to proportional representation. *Gingles,* 478 U.S. at 84, 106 S.Ct. at 2784 (O'Connor, J., concurring in judgment); *Baird v. Cons. City of Indianapolis,* 976 F.2d 357, 359 (7th Cir.1992).

■ Sustained proportional representation of a minority group moreover, actually

negates any claim under § 2(b), unless such sustained success "does not accurately reflect the minority group's ability to elect its preferred representatives." *Gingles,* 478 U.S. at 77, 106 S.Ct. at 2780; *Baird,* 976 F.2d at 361. Although the Supreme Court in *Gingles* did not identify the types of special circumstances that would indicate that a minority group's proportional representation was not an accurate reflection of its voting strength, in *Baird,* the Seventh Circuit explained that "[t]he majority [in *Gingles*] was concerned that black electoral success might be attributable to transient factors such as the pendency of litigation that could lead white voters to throw the minority a bone." *Baird,* 976 F.2d at 361. In neither *Gingles* nor *Baird,* however, were any such "transient factors" found. Rather, in both cases, dispositive, sustained proportional representation was established by examining historical election patterns.

■■■ Both *Gingles* and *Baird* dealt with challenges to multi-member, at-large districts. In contrast, the cases at bar only involve single-member districts. In single-member districts, when a particular minority group constitutes a super-majority (65% of the total population, or 60% of the voting

age population), that minority group is ensured that it will have "a fair opportunity to elect a candidate of their choice." *Ketchum v. Byrne,* 740 F.2d 1398, 1415 (7th Cir.1984).[5] In single-member district cases, "sustained" minority proportional representation may therefore be surmised from the number of single-member districts in which minorities constitute a super-majority. Thus, unless such a minority group has an intentional discrimination claim or there are "special circumstances" indicating that the sustained proportional representation does not accurately reflect the minority group's true electoral strength, it will not have any claim under the Voting Rights Act.

In both of the cases at bar, the Plaintiffs allege that the March 1992 Map violates § 2 of the Voting Rights Act. Since neither case properly alleges intentional discrimination in violation of § 2(a) (see below), the cases must be analyzed in terms of the results approach provided for in § 2(b).

■■ As noted above, in terms of total population city-wide, according to the 1990 Census, African–Americans constitute 38.6% of the population, Caucasians constitute 37.9%, and Hispanics constitute 19.-6%.[6] Under the March 1992 Map, based

---

5. In *Ketchum,* the Seventh Circuit explained that the 65% "figure is derived by augmenting a simple majority with an additional 5% for young population, 5% for low voter registration and 5% for low voter turn-out, for a total increment of 15% ... Obviously if voting age population statistics are used, 5% would drop out of the formula, leaving something in the vicinity of 60% of voting age population as the target percentage ... [O]f course, emerging changes in sociological and electoral characteristics of minority groups and broad changes in political attitudes may substantially alter, or eliminate, the need for a corrective. *The 65% figure, in particular, should be reconsidered regularly to reflect new information and new statistical data.*" *Ketchum,* 740 F.2d at 1415–1416 (emphasis added). In the cases at bar, all of the parties have accepted and applied the *Ketchum* super-majority analysis, and no alternative has been presented to the court. Accordingly, for purposes of this opinion, the court will apply the *Ketchum* super-majority analysis. The court is nevertheless troubled that what was intended to be a loose, statistical approximation has instead become a widely accepted Voting Rights Act benchmark.

6. The court acknowledges Plaintiffs' request that Census Bureau figures that have been "adjusted" for the undercount of minorities be used herein. Under the proposed "adjusted" figures, African–Americans constitute 39.2% of the population (up from 38.6%), Caucasians constitute 38% (up from 37.9%), and Hispanics constitute 18.8% (down from 19.6%). (P.Jt.Response at 4, n. 3). Plaintiffs' requested modification is therefore minuscule. Furthermore, it will not necessarily produce a more accurate result in Chicago. As Judge Posner recently explained in a decision upholding this court, "while a statistical adjustment for the undercount would undoubtedly improve the accuracy of the nationwide census total, there is no consensus among statisticians and demographers that it would make the state and district census totals—the level at which the adjustment would actually affect representation and funding—more accurate. This lack of consensus feeds the concern with a possible loss of public credibility as a consequence of departing from the (perhaps delusive) simplicity of counting heads." *Tucker v. U.S. Dept. of Commerce,* 958 F.2d 1411, 1413 (7th Cir.1992). Moreover, Judge Posner explained, the court "cannot provide a remedy for

upon total population, African–Americans have a 70% super-majority in 38% of the wards, and in 40% of the wards African–Americans constitute at least 55% of the population. Caucasians, in contrast, constitute a majority in only 36% of the wards, and constitute 60% of the population in only 26% of the wards. Under the *Ketchum* 65% standard, African–Americans are therefore virtually guaranteed electoral representation proportional to their percentage of the total city-wide population.

Moreover, there is no reason to believe that this statistically guaranteed representation does not accurately reflect African–Americans' ability to elect their preferred representatives. To the contrary, two of the *Smith* Plaintiffs (aldermen Moore and Shiller, who represent the 49th and 46th wards, respectively) were elected in wards with Caucasian populations greater than 45% both before and after redistricting.

Plaintiffs nevertheless challenge the application of *Baird* to the cases at bar. Plaintiffs concede that African–Americans do have representation proportional to their percentage of the population,[7] but argue that African–Americans have a § 2(b) claim since they are not as proportionately well-represented as Caucasians. Plaintiffs argument is inconsistent, irrelevant, and somewhat deceptive. First, this assertion stems from Plaintiffs' usage of voting-age statistics. Ironically, Plaintiffs simultaneously castigate Defendants for their usage of voting age statistics.[8] Second, using total population figures (as the Supreme Court did in *Gingles*, 478 U.S. at 74, n. 35, 106 S.Ct. at 2779, n. 35, and 478 U.S. at 104, 106 S.Ct. at 2794, O'Connor, J., concurring), African–Americans have a super-majority (65%) in 19 wards (38% of the total), and a 55% majority in 20 wards (40%). Caucasians, meanwhile, have a bare majority in only 18 wards (36%). Therefore, based upon total population statistics, African–Americans are as proportionately well-represented as Caucasians.[9] As a result, Plaintiffs can only claim under-proportional representation with respect to Caucasians if voting-age statistics are used. Even if voting-age statistics are used, African–Americans, who constitute 38.6% of the population, have a super-majority in 38% of the wards.

Most important, however, is the fact that the Voting Rights Act expressly disclaims any entitlement to proportional representation, let alone any entitlement to over-proportional representation. As the Seventh Circuit explained in *Baird,*

> Just as the proviso to § 2(b) ensures that white candidates are free to compete for electoral success that exceeds the ratio of white voters, so blacks must be free to compete for favor; the Voting Rights Act neither sets nor tolerates a cap on their achievements.

*Baird,* 976 F.2d at 359.

The fact that both *Gingles* and *Baird* addressed two race scenari (African–Ameri-

---

a census undercount, at least where the undercount is not the result of an effort to reduce some group's representation or funding but is merely an accident of the census-taking process." *Id. See, also, Burns v. Richardson,* 384 U.S. 73, 92, 86 S.Ct. 1286, 1297, 16 L.Ed.2d 376 (1966) (states are not required to "include aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime, in the apportionment base by which their legislators are distributed"). In the case at bar, Plaintiffs do not allege intentional undercounting. Therefore, only official, unadjusted census figures will be used in the court's analysis.

7. *See, e.g.,* P.Jt.Response at 7 and P.Jt.Response to D's Motion to Submit Supp.Auth. at 3.

8. In Plaintiffs' joint response to Defendants' motion for leave to cite supplemental authority, Plaintiffs state that "Defendants and defendant-intervenors *mistakenly suggest that voting-age population is used as the measure of proportional representation ...*" (P.Jt.Supp.Response at 2, n. 1) (underlining added). Plaintiffs then proceed to point out that "[i]n measuring proportional representation, the Supreme Court used total population, as opposed to voting-age population as defendants and defendant-intervenors urge, as the appropriate measure of proportional representation." *Id.*

9. Plaintiffs assert, without authority, that Caucasians will "politically dominate" a ward if they constitute more than 35% of the population. (P.Jt.Response at p. 17, n. 12). This theory, which would be a significant expansion of the Voting Rights Act, is not supported by any precedent.

cans and Caucasians) as opposed to the three race scenario in the cases at bar (African–Americans, Caucasians, and Hispanics) does not change the effect of a minority group's proportional representation on *its* right to sue under § 2(b). After all, in any community with more than one sizable minority group, not every group can or will be proportionately represented (indeed, § 2(b) expressly disclaims proportional representation). As a consequence, some groups will necessarily be slightly over-represented, and others slightly under-represented. Hence, all groups except for the proportionately best represented group will "have less opportunity than other members of the electorate to … elect representatives of their choice." 42 U.S.C. § 1973(b). Under Plaintiffs' reasoning, therefore, every group other than the best-represented group would have a § 2(b) claim since some other group was slightly better represented.

Plaintiffs' argument ignores the fact that § 2(b) analysis is "based on the totality of the circumstances". 42 U.S.C. § 1973(b). Two such circumstances that cannot be ignored are a group's own proportional representation and the impossibility of perfectly apportioning all seats according to racial percentages. Therefore, if minority groups A and B are both under-represented, minority group C is slightly over-represented, and majority group D is over-represented a tad more than minority group C, C does not have a cause of action under § 2(b) merely because D has slightly better representation. Plaintiffs objection to the application of *Baird* to the cases at bar is therefore unfounded.

Accordingly, Plaintiffs' § 2(b) "discriminatory outcome" claims are dismissed.

██ Even though Plaintiffs do not have a claim under § 2(b), "proof of intentional discrimination under § 2(a) remains an option." *Baird*, 976 F.2d at 360. Plaintiffs, however, do not allege intentional discrimination in violation of § 2(a). Rather, the *Smith* and *Barnett* Amended Complaints are directed at § 2(b)'s "results" test.[10] Indeed, the Plaintiffs themselves unambiguously state, "[t]he focus [of the *Smith* and *Barnett* Amended Complaints] is on the impact of the ward boundaries on the minority population and whether those boundaries have the *effect* of diluting minority voting strength" (emphasis added). P.Jt.Response to D's Motion to Submit Supp.Auth, at 4. Neither the *Smith* nor the *Barnett* Amended Complaints even contains the words "intentional discrimination" or "discriminatory purpose," and nowhere in Plaintiffs' joint response brief or in their response to Defendants' motion to submit supplementary authority is it even inferred that the alleged violations of the Voting Rights Act stemmed from *intentional* discrimination. Accordingly, Plaintiffs have not properly alleged intentional discrimination in violation of § 2(a) of the Voting Rights Act. Since Plaintiffs do not have a claim under § 2(b), both the *Smith* and *Barnett* Voting Rights Act claims are hereby dismissed.[11]

B. The *Barnett* Plaintiffs' 14th and 15th Amendment Claims Against the March 1992 Map.

██ To prevail on a claim based upon either the 14th or 15th Amendments, a plaintiff must allege and prove the existence of discriminatory intent on the part of the defendant. *Mobile v. Bolden*, 446 U.S. 55, 62, 66, 100 S.Ct. 1490, 1497, 1499, 64 L.Ed.2d 47 (1980); *Ketchum*, 740 F.2d

---

**10.** The *Smith* Amended Complaint states that "[t]he ward map for the City of Chicago … violates the Voting Rights Act and is not valid." *Smith* Amended Complaint at ¶ 27. The *Barnett* Amended Complaint is no more specific: "[t]he [March 1992 Map] results in the denial and abridgment of the right of Black citizens of Chicago to have an equal vote, on account of race and/or color, in contravention of the guarantees set forth in Section 2 of the Voting Rights Act." *Barnett* Amended Complaint at ¶ 86.

**11.** Because the *Smith* Amended Complaint is therefore dismissed in its entirety, the *Smith* Defendants' arguments regarding whether the City Council is a suable entity and whether certain of the *Smith* Plaintiffs have standing (*i.e.,* the aldermen plaintiffs) are moot. The parties should note, however, that in the accompanying opinion addressing the motion to dismiss *Bonilla*, this court held that the City Council was not a suable entity.

at 1403. Consequently, to establish that a particular reapportionment plan violates either the 14th or 15th Amendments, a plaintiff must plead and prove that the plan was conceived or operated as a purposeful device to further racial discrimination. *Bolden*, 446 U.S. at 62–66, 100 S.Ct. at 1497–1499.

The Seventh Circuit, moreover, has recently held that discriminatory effect alone does not establish unconstitutional discrimination:

> the only discrimination forbidden by these provisions [the 14th Amendment equal protection clause and the 5th Amendment due process clause] is *intentional* discrimination. Disparate impact, which means the unintended consequence of measures adopted for reasons unrelated to any intention to discriminate, is not, under the Supreme Court's current interpretation of the Constitution, an acceptable basis for a finding of *unconstitutional* discrimination, whatever the significance of such a showing may be under the civil rights statutes.

*Tucker*, 958 F.2d at 1413–1414 (emphasis in original). *See, also, Illinois Legislative Redistricting Com. v. LaPaille*, 786 F.Supp. 704 (N.D.Ill.1992) ("in addition to failing to prove a discriminatory effect for 14th and 15th Amendment purposes, the Gardner parties have also failed to prove a discriminatory motive as required under those amendments"). *Id.* at 717.

The *Barnett* Plaintiffs allege that the March 1992 Map violated the 14th and 15th Amendments, but they do not allege *intentional* discrimination or discriminatory purpose. Nevertheless, the *Barnett* Plaintiffs assert that the mere allegation of a discriminatory effect (i.e., "packing") is sufficient to state a claim under the 14th and 15th Amendments. In support of their position, the *Barnett* Plaintiffs cite *Rybicki v. State Bd. of Elections*, 574 F.Supp. 1082, 1110 (N.D.Ill.1982) (hereafter, "*Ry-*

*bicki* I") and *Ketchum*, 740 F.2d at 1409, which, in dictum, favorably commented on the portion of *Rybicki* I cited by the *Barnett* Plaintiffs.

The *Barnett* Plaintiffs reliance on *Rybicki* I and *Ketchum* is misplaced. In *Rybicki* I, Judge Cudahy found that "under the peculiar circumstances of this case", the instances of population manipulation "are so closely linked to a desire to minimize black voting strength that they constitute strong evidence of a discriminatory purpose." *Rybicki*, 574 F.Supp. at 1109–1110. Judge Cudahy also found that "*[t]his* unnecessary packing represents intentional dilution of the black vote." *Id.* at 1110 (emphasis added). In so writing, however, Judge Cudahy was not universally equating packing with intentional discrimination, but was merely making a narrow legal conclusion based upon a precise fact situation. Likewise, the *Ketchum* dictum that favorably commented on *Rybicki* I (and which was also written by Judge Cudahy) should also not be converted into a universal truism.[12]

Accordingly, the court concludes that discriminatory intent is a necessary element for a 14th or 15th Amendment claim, and that a mere allegation of packing does not infer intentional discrimination. The *Barnett* Plaintiffs' 14th and 15th Amendment challenges to the March 1992 Map are therefore dismissed.

**C. The *Barnett* Plaintiffs' Challenges to the March 17, 1992 Referendum Ballot.**

As noted above, in Count II, the *Barnett* Plaintiffs allege that the March 17, 1992 referendum ballot (the "Ballot") violates "the hereinbefore mentioned constitutional and statutory rights." *Barnett* Amended Comp. at ¶ 91. Although the *Barnett* Plaintiffs do not specifically identify to which rights they are referring, the court presumes that the *Barnett* Plaintiffs are alleging violations of the Civil Rights Act,

---

**12.** "Despite these considerable indications of minority voting strength dilution through manipulation, packing and fracturing, which in *Rybicki* I were (we think correctly) held to constitute intentional racial discrimination, we think it is unnecessary to make a formal finding that the 1981 City Council map constitutes intentional racial discrimination." *Ketchum*, 740 F.2d at 1409.

the Voting Rights Act, and the 14th and 15th Amendments, all of which were all mentioned earlier in the complaint.

The essence of the Ballot challenge of the *Barnett* Plaintiffs is their contention that it "did not adequately, accurately, properly or intelligently advise the voters of what, or for what, the voter was casting his or her ballot." *Id.* This contention is premised upon two theories: first, that the Ballot was insufficient because the proposed maps themselves were not displayed on the Ballot; and, second, that the Ballot was insufficient because the list of aldermen submitting each map was not in the order that the *Barnett* Plaintiffs contend would have been most logical.

The *Barnett* Defendants, in response, contend that the *Barnett* Plaintiffs lack standing to bring this claim.[13] This argument is premised upon the failure of the *Barnett* Plaintiffs to plead that they themselves were confused or otherwise injured by the Ballot, or even that they voted in the March 17, 1992 referendum.

To have standing, a plaintiff must establish three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized ... and (b) "actual or imminent, not 'conjectural' or 'hypothetical' " ... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." ... Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision" (citations eliminated).

*Lujan v. Defenders of Wildlife,* —— U.S. ——, at ——, 112 S.Ct. 2130, at 2136, 119 L.Ed.2d 351 (1992); *see, also, People Organized For Welfare & Employment Rights (P.O.W.E.R) v. Thompson,* 727 F.2d 167, 171 (7th Cir.1984) (to support a federal cause of action, an injury "must in short be fairly describable as an injury personal to the plaintiff—a deprivation of *his* right—rather than a concern with another's injury" (emphasis in original)).

■ The *Barnett* Plaintiffs have not alleged any injury personal to *them.* They have not alleged that they were personally confused by the Ballot, nor that any confusion suffered by others caused the *Barnett* Plaintiffs to suffer injury. Furthermore, the *Barnett* Plaintiffs have not even alleged that they voted in the referendum. Rather, the *Barnett* Plaintiffs have only alleged that the Ballot was ambiguous, illogical, and confusing to "voters." The *Barnett* Plaintiffs have therefore not properly plead the necessary standing elements. Count II of the *Barnett* Amended Complaint is therefore dismissed.[14]

### D. The *Barnett* Plaintiffs Civil Rights Act Claims.

In paragraph 1 of the *Barnett* Amended Complaint, the *Barnett* Plaintiffs list several sections from the Civil Rights Act, 42 U.S.C. § 1981, *et seq.*, and then later allege that "[t]he [March 1992 Map] violates and is repugnant to the hereinbefore set forth constitutional and statutory rights ..." *Barnett* Amended Complaint at ¶ 85. The *Barnett* Plaintiffs do not allege any facts to support their Civil Rights Act claims. Furthermore, the *Barnett* Plaintiffs did not even respond to the arguments regarding the Civil Rights Act claims. Accordingly, the *Barnett* Plaintiffs Civil Rights Act claims are hereby dismissed.

### E. Count III of the *Barnett* Amended Complaint.

Count III of the *Barnett* Amended Complaint adopts the allegations contained in

**13.** For reasons that are unknown to the court, the *Barnett* Plaintiffs wrongly characterize the *Barnett* Defendants' standing claim as challenging the *Barnett* Plaintiffs' standing to object to the March 1992 Map, rather than to their standing to challenge the Ballot.

**14.** Although the court therefore need not address the substance of Count II, the court is somewhat surprised that the *Barnett* Plaintiffs would allege that the Ballot itself violated the Civil Rights Act, the Voting Rights Act, the 14th Amendment and the 15th Amendment, and then be unable or unwilling to cite a single case in support thereof in their response brief.

Counts I and II, and asks the court to enact some undisclosed map to be drawn by the *Barnett* Plaintiffs and to hold special elections under that map. This request for an additional remedy does not set forth any legal theory other than theories which this court has already dismissed. Count III is therefore dismissed for the same reasons that the *Barnett* Plaintiffs' other claims have been dismissed.

## CONCLUSION

For all of the foregoing reasons, the *Barnett* and *Smith* Amended Complaints are hereby dismissed.