Richard BARNETT, Ed H. Smith, Allan Streeter, Helen Shiller, John O. Steele, Dorothy Tillman, Lawrence S. Bloom, Robert Shaw, Jesse J. Evans, Bobby L. Rush, Percy Giles, William M. Beavers, Toni Preckwinkle, Rickey Hendon, Joe Moore, Arenda Troutman, Shirley A. Coleman, Virgil E. Jones, Jesse Miller, Sam Burrell, and Political Action Conference of Illinois, Timuel Black, Rosemary Oliver, Eddie Read, Georgia Trevan, Conrad Worrill, Chauncery Stroud, Leonard Owens and Eugene Ford, Plaintiffs,

v.

Richard M. DALEY, the City of Chicago, and Board of Election Commissioners of Chicago, Defendants.

and

Carole Białczak, Thomas Murphy, Patrick M. Huels, James Laski, Anthony C. Laurino, Ginger Rugai, Patrick J. Levar, John S. Madrzyk, Theodore Mazola, Lemuel Austin, Jr., Edwin Eisendrath, Edward Burke, William J.P. Banks, Bernard L. Stone, Eugene C. Schulter, John Buchanan, Mary Ann Smith, Brian Doherty, Lorraine L. Dixon, Theris M. Gabinski, Burton F. Natarus, Bernard J. Hansen, Richard F. Mell, Mark Fary, Patrick J. O'Connor, and Michael J. Wojcik, Defendant Intervenors.

Nos. 92 C 1683, 92 C 2104.

United States District Court, N.D. Illinois, E.D.

Oct. 8, 1993.

Nathaniel R. Howse, Jr., Philander Scott Neville, Jr., Howse, Howse, Neville & Gray, Chicago, IL, for Richard Barnett, Tim Black, Rosemary Oliver, Leonard Owens, Eugene Ford.

Kelly Raymond Welsh, Susan R. Lichtenstein, Andrew S. Mine, City of Chicago, Law Dept., Corp. Counsel, Chicago, IL, for Richard M. Daley.

Joel T. Pelz, Jerold Sherwin Solovy, Barry Sullivan, Jenner & Block, Chicago, IL, for Theodore Mazola, Lorraine Dixon, John Buchanan, Patrick M. Huels, Mary J. Fary, John S. Madrzyk, Edward M. Burke, Thomas Murphy, Ginger Rugai, James J. Laski, Ambrosio Medrano, Luis Gutierrez, Ray Suarez, Terry M. Gabinski, Richard F. Mell, Lemuel Austin, Jr., Michael A. Wojcik, William J.P. Banks, Thomas W. Cullerton, Anthony C. Laurino, Patrick J. O'Connor, Brian Doherty, Burton F. Natarus, Edward Eisendrath, Bernard J. Hansen, Patrick J. Levar,

Eugene C. Schulter, Mary Ann Smith, Bernard L. Stone.

Matthew J. Piers, Jonathan A. Rothstein, Vanessa Jean Weathersby, Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., Chicago, IL, for Jesus Garcia.

Joel T. Pelz, Jerold Sherwin Solovy, Barry Sullivan, Jenner & Block, Richard Arthur Devine, David Alan Bonoma, Pope & John, Ltd., Chicago, IL, for Carole Bialczak.

Michael Levinson, Bd. of Election Com'r, Chicago, IL, for Michael J. Hamblet, Arnette Hubbard, Chris Robling.

James Michael Scanlon, Rieff & Scanlon, Chicago, IL, for Bd. of Election Com'rs of City of Chicago.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This case comes before the Court on the motion of the defendants and defendant-intervenors (hereafter, jointly, the "Defendants") to dismiss the *Barnett* and *Smith* Plaintiffs' Second Amended Complaint for failure to state a claim upon which relief may be granted. The Defendants assert, among other things, that the Plaintiffs' claim fails because it does not sufficiently allege both intent to discriminate *and* a resulting discriminatory effect. For the reasons discussed below, the Court hereby grants the motion to dismiss with prejudice.

## BACKGROUND

This action originally began as two separate lawsuits, each of which challenged the redistricting of Chicago's aldermanic wards following the 1990 Census. In *Barnett v. Daley,* a group of African–American, registered voters in the City of Chicago alleged that the March 1992 Ward Map "packs" African–American voters into super-majority wards (i.e., excessively concentrates them)

without similarly packing whites. Meanwhile, in *Smith v. Daley,* a group of African–American and white Chicago aldermen, as well as the Political Action Conference of Illinois, alleged that the March 1992 Map maximizes the political power of whites by "fracturing" African–American communities (i.e., splitting them into more than one district with the result that African–Americans constitute an ineffective political grouping in each) and drawing majority white wards that "borrow" population from other groups. *See, Barnett v. Daley,* 809 F.Supp. 1323, 1325–1327 (N.D.Ill.1992) (Duff, J.) (hereafter, "*Barnett I* ").

On December 21, 1992, this Court dismissed both the *Barnett* and *Smith* first amended complaints. *Id.* at 1333. After two unsuccessful attempts to file another complaint, on February 22, 1993, the *Barnett* and *Smith* Plaintiffs jointly filed the instant Second Amended Complaint (hereafter, the "Complaint") which alleges that the March 1992 Ward Map intentionally dilutes the voting rights of Chicago's African–American voters in violation of the Voting Rights Act (Count I) and the 14th and 15th Amendments to the United States Constitution (Count II). (¶¶ 1, 53, 60).[1] The factual allegations for each count are essentially the same.

Indeed, the vote dilution alleged in the Complaint is essentially the same as that which this Court previously rejected.[2] Specifically, the Plaintiffs allege that the March 1992 Ward Map has diluted their voting rights by intentionally depriving them of: 1) the number of wards that accurately reflects the African–American community's "true electoral strength," i.e., the maximum possible number of super-majority African–American wards (¶¶ 31, 56) and 2) the same or more "African–American wards" as there are "white wards" (¶ 54). The only significant difference between the instant Complaint and the earlier versions dismissed in *Barnett I* is that the Plaintiffs have added the word "intentional" to their claims.

1. All "¶ —" references are to paragraphs of the Complaint.

2. In *Voinovich v. Quilter,* —— U.S. ——, ——, 113 S.Ct. 1149, 1155, 122 L.Ed.2d 500 (1993), the Supreme Court explained that both fracturing and packing are devices which may be used to

dilute minority voting strength. Hence, the Plaintiffs are playing semantic games when they assert that this Court made no finding as to vote dilution simply because *Barnett I* never uses the term "dilution."

On March 8, 1993, the Defendants filed a motion to dismiss the Complaint. On July 22, 1993, this Court asked the Defendants to revise and refile their motion to dismiss in light of several recent Supreme Court decisions. On August 5, 1993, the Defendants filed a revised motion to dismiss which raises two primary issues: first, whether the proportional representation analysis applied in *Barnett I* is outdated in light of the recent Supreme Court decisions, and second, if not, whether the Plaintiffs have otherwise cured the fatal defects in their pleading. The answer to both queries is "no".

### DISCUSSION

 The standard governing this Court's decision on a Rule 12(b)(6) motion to dismiss is well established. Only if the allegations in the complaint, and all reasonable inferences drawn therefrom, could not support any cause of action may this court grant the motion. *See generally,* Charles Wright & Arthur Miller, 5A *Federal Practice and Procedure:* Civil 2d § 1357 (West Publishing, 2d ed. 1990). The court, however, need not strain to find inferences favorable to the Plaintiffs which are not apparent on the face of the Complaint. *Coates v. Illinois State Board of Education,* 559 F.2d 445, 447 (7th Cir.1977). The Court must nevertheless interpret ambiguities in the complaint in favor of the Plaintiffs, and the Plaintiffs are free, in defending against the motions, "to allege without evidentiary support any facts [they] please[ ] that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved … would entitle [them] to judgment." *Early v. Bankers Life and Casualty Co.,* 959 F.2d 75, 79 (7th Cir.1992). Nevertheless, when deciding a motion to dismiss, this Court is "not required … to ignore any facts alleged in the complaint that undermine the plaintiffs' claims." *Arazie v. Mullane,* 2 F.3d 1456, 1465 (7th Cir.1993).

### I. *The Voting Rights Act Claim.*

In *Barnett I,* this Court held that since both sets of plaintiffs conceded that African-Americans were statistically assured of sustained proportional representation under the March 1992 Ward Map, the *Barnett* and *Smith* plaintiffs did not, as a matter of law,

have a cause of action under § 2(b) of the Voting Rights Act. *Barnett I,* 809 F.Supp. at 1327–1330. This Court nevertheless explained that "[e]ven though Plaintiffs do not have a claim under § 2(b), 'proof of intentional discrimination under § 2(a) [of the Voting Rights Act] remains an option.'" *Id.* at 1330, quoting *Baird v. Indianapolis,* 976 F.2d 357, 360 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993). In other words, even if Chicago has "[a] balanced bottom line", it could not, for example, actually bar African–Americans from voting in wards other than those where they constitute a super-majority or interfere with their right to register or their access to polling places. *Baird,* 976 F.2d at 359.

This Court's conclusion about the effect of sustained proportional representation on a minority group's vote dilution claim has been strengthened by recent voting rights cases. In *Voinovich,* for example, the Supreme Court emphasized that § 2 of the Voting Rights Act

> focuses *exclusively on the consequences of apportionment.* Only if the apportionment scheme has the *effect* of denying the protected class the equal opportunity to elect its candidate of choice does it violate § 2; where such effect has not been demonstrated, § 2 simply does not speak to the matter. Indeed, in *Gingles,* we expressly so held: "Electoral devices … may not be considered *per se* violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process."

*Voinovich,* —— U.S. at ——, 113 S.Ct. at 1156, 122 L.Ed.2d 500 (emphasis added; citation deleted). Likewise, on August 4, 1993, the Eighth Circuit addressed arguments identical to those raised by the Plaintiffs and held that proportional representation bars claims of vote dilution, including intentional vote dilution claims under the Voting Rights Act and the 14th and 15th Amendments. *African American Voting Rights Legal Defense Fund, Inc. v. Villa,* 999 F.2d 1301 (8th Cir.1993).

Notwithstanding their assertion of vote dilution, as in *Barnett I,* the Plaintiffs acknowledge that the March 1992 Ward Map "provides African–American with 19 …

wards"—38% of the total number of wards. (P.Br. at 3, n. 4).[3] In *Barnett I*, this Court explained that

> [i]n single-member districts, when a particular minority group constitutes a super-majority (65% of the total population, or 60% of the voting age population), that minority group is ensured that it will have "a fair opportunity to elect a candidate of their choice."

*Barnett I*, 809 F.Supp. at 1328, *quoting Ketchum v. Byrne*, 740 F.2d 1398, 1415 (7th Cir.1984). Thus, in single-member districts such as Chicago's aldermanic wards, "sustained" minority proportional representation may be surmised from the number of single-member districts in which minorities constitute a super-majority.

When the *Ketchum* analysis is applied to the 1990 Census figures attached to the Complaint, African–Americans may be deemed to have sustained proportional representation according to total population (i.e., they constitute 38.6% of the total population citywide, and constitute more than 65% of the total population in 38% of the wards) and sustained over-representation according to voting age population (i.e., they constitute 35.7% of the city's voting age population, but constitute 60% of the voting age population in 38% of the wards).[4] *See, Barnett I*, 809 F.Supp. at 1328–1329. Whites are slightly under-proportionately represented according to total population (i.e., they constitute 37.9% of the total population, and have a bare majority in 36% of the wards), and are slightly over-represented according to voting age population (i.e., they constitute 43.5% of the voting age population, and have a bare majority in 46% of the wards).[5]

3. Although the Plaintiffs concede that there are 19 "African–American wards" under the March 1992 Ward Map (38% of the total), they assert that this "is less than proportional representation" since African–Americans constitute 38.6% of the total population. (P.Br. at 3, n. 4). This distinction is statistically insignificant. Moreover, as noted below, if proportional representation is measured by voting age population, African–Americans are actually over-represented (since African–Americans constitute 35.7% of Chicago's voting age population, but are statistically assured of 19 African–American wards). Finally, this Court has already ruled that only official, unadjusted census figures will be used in its analysis of this case. *Barnett I*, 809 F.Supp. at 1328–1329.

4. According to the 1990 Census, Chicago's total population is 2,783,726, of which 1.074,471 (38.6%) are African–American, 1,056,048 (37.9%) are white, and 545,852 (19.6%) are Hispanic. (Comp., Ex. A). By voting age population, Chicago is 35.7% African–American, 43.5% white, and 16.8% Hispanic. (Comp., Ex. B).

5. The racial composition of Chicago's 50 wards under the March 1992 Ward Map (according to total population) is as follows:

| % of pop. in a given ward | # of wards in which **whites** constitute the given % | # of wards in which **blacks** constitute the given % | # of wards in which **Hispanics** constitute the given % |
|---|---|---|---|
| >35% | 24 | 20 | 10 |
| >40% | 24 | 20 | 8 |
| >45% | 22 | 20 | 7 |
| >50% | 18 | 20 | 7 |
| >55% | 18 | 20 | 7 |
| >60% | 13 | 19 | 7 |
| >65% | 12 | 19 | 7 |
| >70% | 12 | 19 | 3 |

Using voting age population, rather than total population, the breakdown is as follows:

| % of pop. in a given ward | # of wards in which **whites** constitute the given % | # of wards in which **blacks** constitute the given % | # of wards in which **Hispanics** constitute the given % |
|---|---|---|---|
| >35% | 24 | 20 | 8 |
| >40% | 24 | 20 | 7 |
| >45% | 23 | 20 | 7 |
| >50% | 23 | 20 | 7 |
| >55% | 18 | 19 | 7 |
| >60% | 18 | 19 | 6 |
| >65% | 13 | 18 | 3 |
| >70% | 12 | 16 | 1 |

These charts were created from data presented in Exhibits A and B to the Complaint.

In the current Complaint, the only electoral "practice" which the Plaintiffs challenge is the March 1992 Ward Map, and the only discriminatory effect which they allege to flow from the map is "vote dilution." (¶ 1; P.Br. at 6). They do not allege the sort of intentional discrimination under § 2(a) of the Voting Rights Act that was discussed in *Baird.*

▮ By definition, an electoral practice which provides proportional representation for a minority group cannot be found to "dilute" that group's voting rights. In *Baird,* the plaintiffs argued that even though Indianapolis' single-member districts gave them proportional representation on a city-wide basis, they nevertheless had a vote dilution claim because 4 of the city's 29 representatives are elected at large. In rejecting this argument, the Seventh Circuit explained that,

> States attempt to comply with the Voting Rights Act by creating conditions conducive to success by minorities *throughout the jurisdiction as a whole.* That it [sic] why it does not violate the Act to have some districts in which black voters form a minority and are unlikely to elect candidates of their choice.... Considerations of this kind persuaded the district court to measure black voters' likely success by referring to all 29 seats rather than just the four at-large seats.... *Every plan that has ever been devised measures opportunities for electoral success across multiple seats.*

6. As noted above, the minority group, or an individual, would have a claim if some other practice intentionally barred them from exercising their right to vote in any district. *Baird,* 976 F.2d at 359.

7. Contrary to the Plaintiffs' urging, this Court does not accord great weight to the Supreme Court's one-sentence order vacating the district court's opinion in *Burton v. Sheheen,* 793 F.Supp. 1329 (D.S.C.1992), *vacated sub nom, Campbell v. Theodore,* — U.S. ——, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993). As the Defen-

*Baird,* 976 F.2d at 359–360 (emphasis added; citation deleted).[6]

▮ In essence, the Plaintiffs' central premise is that they are entitled to 22 African–American super-majority wards simply because the creation of that number of wards is demographically feasible. This assertion ignores the proviso in § 2(b) of the Voting Rights Act "[t]hat nothing in this section establishes` a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b).

Moreover, strictly using either voting age population or total population, African–Americans are as well-represented proportionately as whites.[7] Whites may be deemed to be better represented proportionately than African–Americans only if voting age population is used to measure "control" of a ward, and total population is used to measure the number of seats that each ethnic group is "entitled to" in order for each to be precisely, proportionately represented.

This hybrid measure of relative black/white, electoral representation is of marginal relevance at best in the case at bar. First, it ignores the *Ketchum* super-majority analysis that both parties accepted and applied earlier in this litigation. *See, Barnett I,* 809 F.Supp. at 1328, n. 5. According to *Ketchum,* either voting age population *or* total population may be used to measure "control" of a single-member electoral district. *Ketchum,* 740 F.2d at 1415.

dants duly note, "[a]pparently plaintiffs believe that the legal effect of the order is to repudiate every statement in the lower court's opinion and to adopt every statement from the Solicitor General's brief. Defendants are unaware of any authority for this remarkable proposition." (D.Reply at 7). Moreover, the principal reason proffered by the Solicitor General for vacating *Burton* is that "[t]he district court misunderstood the nature of the action before it. That error led the court to give inadequate consideration to, and to make inadequate findings concerning, allegations and evidence of violations of Section 2 of the Voting Rights Act." (Br. at 19).

Second, the Plaintiffs have not cited any proportional representation case which has relied on such an analytical approach, nor is this Court aware of any. To the contrary, in *Gingles*, the Supreme Court measured proportional representation by comparing the minority group's percentage of the total population to its percentage of elected representatives. *Thornburg v. Gingles*, 478 U.S. 30, 74, n. 35, 106 S.Ct. 2752, 2778 n. 35, 92 L.Ed.2d 25 (1986). In *Villa*, the Eighth Circuit measured proportional representation "by comparing the minority group's percentage of the voting age population to the minority group's percentage of elected representatives." *Villa*, 999 F.2d at 1302.

Third, by requiring a super-majority for "minority" wards and a bare majority for "white" wards, one would expect that where the African–American and white total populations are roughly equal, that, everything else being neutral, there would be more "white wards" than "African–American wards."

Finally, as this Court explained in *Barnett I,*

> in any community with more than one sizable minority group, not every group can or will be proportionately represented (indeed, § 2(b) expressly disclaims proportional representation). As a consequence, some groups will necessarily be slightly over-represented, and others slightly under-represented. Hence, all groups except for the proportionately best represented group will "have less opportunity than other members of the electorate to ... elect representatives of their choice." 42 U.S.C. § 1973(b). Under Plaintiffs' reasoning, therefore, every group other than the best-represented group would have a § 2(b) claim since some other group was slightly better represented.
>
> Plaintiffs' argument ignores the fact that § 2(b) analysis is "based on the totality of the circumstances". 42 U.S.C. § 1973(b). Two such circumstances that cannot be ignored are a group's own proportional

representation and the impossibility of perfectly apportioning all seats according to racial percentages. Therefore, if minority groups A and B are both under-represented, minority group C is slightly over-represented, and majority group D is over-represented a tad more than minority group C, C does not have a cause of action under § 2(b) merely because D has slightly better representation.

*Barnett I*, 809 F.Supp. at 1330. Hence, under the "totality of the circumstances", this hybrid measurement of relative, black/white electoral representation is insufficient to state a claim under the Voting Rights Act.

As a final note, there are no "special circumstances" which indicate that the sustained proportional representation of African–Americans "does not accurately reflect the minority group's ability to elect its preferred representatives." *Gingles*, 478 U.S. at 77, 106 S.Ct. at 2780.[8]

Accordingly, because the Plaintiffs do not allege any discriminatory effect other than vote dilution, and because they do not allege the sort of intentional discrimination under § 2(a) of the Voting Rights Act that was discussed in *Baird*, this Court concludes that the Plaintiffs do not have a claim under either § 2(a) or § 2(b) of the Voting Rights Act. Since the Plaintiffs have now filed or attempted to file a total of seven complaints, none of which have stated a proper claim under the Voting Rights Act, the Plaintiffs' Voting Rights Act claim (i.e., Count I) is hereby dismissed with prejudice.

## II. *The 14th and 15th Amendment Claims.*

The United States Supreme Court has held that three types of state voting practices could give rise to a constitutional claim. The first involves voting practices or procedures which directly deprive persons of the right to vote (e.g., a poll tax or literacy test). *See, e.g., Guinn v. United States*, 238

---

**8.** "Although the Supreme Court in *Gingles* did not identify the types of special circumstances that would indicate that a minority group's proportional representation was not an accurate reflection of its voting strength, in *Baird*, the Seventh Circuit explained that '[t]he majority [in

*Gingles* ] was concerned that black electoral success might be attributable to transient factors such as the pendency of litigation that could lead white voters to throw the minority a bone.' " *Barnett I*, 809 F.Supp. at 1328, *quoting Baird*, 976 F.2d at 361.

U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915). That variety is not implicated here.[9]

The second involves practices which reduce or nullify minority voters' ability, as a group, "to elect the candidate of their choice." ... [S]uch schemes violate the Fourteenth Amendment when they are adopted with a discriminatory purpose and have the effect of diluting minority voting strength.

*Shaw v. Reno,* — U.S. —, —, 113 S.Ct. 2816, 2823, 125 L.Ed.2d 511 (1993), *quoting Allen v. State Board of Elections,* 393 U.S. 544, 569, 89 S.Ct. 817, 833, 22 L.Ed.2d 1 (1969). *See also, Illinois Legislative Redistricting Com. v. LaPaille,* 786 F.Supp. 704, 717 (N.D.Ill.1992) ("in addition to failing to prove a discriminatory effect for 14th and 15th Amendment purposes, the Gardner parties have also failed to prove a discriminatory motive as required under those amendments"). As discussed above, the challenged action in the case at bar does not have the *effect* of unduly diminishing the influence of African Americans on the political process. Hence, this second type of constitutional voting practice claim is not applicable.

The third type of constitutional voting practice claim is the new type recognized in *Shaw.* In *Shaw,* the Supreme Court held that the appellants stated a valid claim under the Equal Protection Clause by alleging that the North Carolina General Assembly adopted a reapportionment scheme

that is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles and without sufficiently compelling justification.

*Id.* — U.S. at —, 113 S.Ct. at 2824. The Plaintiffs here make no such allegation of bizarre, irrational district configurations. Rather, they merely allege city-wide vote dilution. As a result, they do not have a claim under either the 14th or 15th Amend-ments. Ironically, however, the Plaintiffs' proposed remedy might provide white and Hispanic voters with a cause of action under *Shaw.* After all, by demanding maximum representation, the Plaintiffs are requesting an intentional racial gerrymander in favor of African Americans.

Accordingly, the Plaintiffs' 14th and 15th Amendment claims (i.e., Count II) are hereby dismissed.[10] Because this is the Plaintiffs' seventh trip to the plate, the dismissal is with prejudice.

## CONCLUSION

For all of the foregoing reasons, the *Barnett* and *Smith* Plaintiffs' Second Amended Complaint is hereby dismissed with prejudice. Defendant Daley's separate motion to dismiss is denied as moot.

---

9. The Supreme Court "has not decided whether the Fifteenth Amendment applies to vote-dilution claims; in fact, [the Supreme Court] never [has] held any legislative apportionment inconsistent with the Fifteenth Amendment." *Voinovich,* — U.S. at —, 113 S.Ct. at 1158.

10. The Court therefore need not reach the Defendants' arguments regarding the adequacy of the Complaint's allegations of "intent" or Defendant Daley's separate motion to dismiss.