908 F.2d 851
 61 Ed. Law Rep. 1188
 David LUCAS, Willie Davis, Jr., Connie Cater, Corlis
McKenzie and Ronnie T. Miley, Plaintiffs-Appellants,
v.
Judy TOWNSEND, in her official capacity as President of the
Board of Education, Bibb County Board of Education, Emory
Greene in his official capacity as Chairman of the Bibb
County Board of Commissioners, Bibb County Board of
Commissioners, A.B. "TONY" Caldwell in his official capacity
as Chairman of the Macon-Bibb County Board of Elections,
Macon-Bibb County Board of Elections, Bernard Fletcher, in
his official capacity as Supt., Macon-Bibb County Board of
Elections, Defendants-Appellees.
 No. 89-8556.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 9, 1990.
 
 Neil Bradley and Kathleen Wilde, American Civil Liberties Union Foundation, Inc., Atlanta, Ga., for plaintiffs-appellants.
 W. Warren Plowden, Jr., Craig N. Cowart, and Edward S. Sell, Jr., Jones, Cork & Miller, Macon, Ga., and Della Wager Wells, King & Spalding, Atlanta, Ga., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Georgia.
 Before HATCHETT, Circuit Judge, RONEY* and FAIRCHILD**, Senior Circuit Judges.
 HATCHETT, Circuit Judge:
 
 
 1
 In this voting rights case, we reverse the district court and hold that the form in which a referendum question is presented to voters may constitute a standard, practice, or procedure within the meaning of section 2 of the Voting Rights Act.
 
 FACTS
 
 2
 In 1987, the Board of Public Education and Orphanage for Bibb County ("the Board") began planning a referendum requesting the voters of Bibb County to approve the issuance of general obligation bonds. The bonds were to provide funds to build a new high school and middle school, and to complete the air conditioning in all of the existing county schools. Initially, the Board planned to include all the projects in a single referendum scheduled for May, 1989. Subsequently, the Board voted to separately offer the air conditioning project in a referendum scheduled for March 8, 1988, the date of the presidential preference primary, popularly known as "Super Tuesday."
 
 
 3
 The Board reversed this decision, changing the date for the referendum to May 31, 1988, and combining all the projects in a single referendum. The Board explains this change by pointing out that the Super Tuesday ballot also contained a referendum to raise the sales tax in Bibb County. According to the Board, voters might have been reluctant to pass two bond referendums; thus, both may have been defeated. Bibb County citizens, some of whom are appellants in this case, charged that the Board changed the date to avoid the heavy African-American voter turnout expected because of Jesse Jackson's name on the ballot. These citizens also charged that the Board combined the air conditioning project, initially scheduled as a separate referendum question on Super Tuesday, with the other projects to dilute the minority vote. Allegedly, African-American voters favored the air conditioning project, but did not favor new schools. These citizens complained that voters supporting one project were forced to vote in favor of other projects they did not support. The Board, composed of six white and four African-American members, split along racial lines in voting whether to combine the projects in one referendum, with the African-American members present voting against combining the projects in a single referendum.
 
 
 4
 The School Board sought preclearance from the Attorney General for the May 31st referendum pursuant to section 5 of the Voting Rights Act of 1965 ("the Act").[1] On May 25th, the Justice Department informed the Board that it could not preclear the referendum without further information.
 
 PROCEDURAL HISTORY
 
 5
 On May 27, 1988, David Lucas, Willie Davis, Jr., Connie Cater, Corlis McKenzie, and Ronnie T. Miley ("the appellants") filed this lawsuit in the Middle District of Georgia seeking declaratory and injunctive relief. The appellants sought to enforce the provisions of section 5 of the Act and to enjoin "deprivation under color of state law, statute, ordinance, regulation, custom or usage of the rights, privileges and immunities secured to plaintiffs by 42 U.S.C. Secs. 1971, 1973, 1973c and 1983, and the first, thirteenth, fourteenth and fifteenth amendments of the Constitution of the United States...." The appellants also filed a motion for a preliminary injunction. A three-judge court denied preliminary injunctive relief, holding that section 5 of the Act did not require preclearance of the date selected for a special referendum.[2] Lucas v. Townsend, 686 F.Supp. 902 (M.D.Ga.1988). The Supreme Court granted an injunction pending appeal on May 30, 1988. Because of state law notice requirements for holding a bond referendum, the postponement resulting from the injunction rendered the appeal moot, and it was dismissed.
 
 
 6
 On June 9, 1988, the Board approved a new bond referendum for $29 million which combined the building projects and the air conditioning project plus funding for a magnet school program at Northeast High School. Board members defeated an amendment to separate each of the four projects into individual questions on the ballot. The Board scheduled the referendum for November 8, 1988, the date of the general election, including the presidential election. The Attorney General granted preclearance for the new bond referendum under section 5.
 
 
 7
 In October, 1988, the appellants filed a second motion in the district court for injunctive relief claiming that the form of the referendum had not been precleared.[3] In an amicus brief, the Attorney General asserted that the decision to combine multiple projects in a single bond referendum was not a voting qualification, or a prerequisite to voting, or a standard, practice, or procedure with respect to voting as controlled by section 5 of the Act. A three-judge court denied the motion for a preliminary injunction under section 5, substantially adopting the Attorney General's position. Lucas v. Townsend, 698 F.Supp. 909 (M.D.Ga.1988). The three-judge court's order was not appealed. On November 8, 1988, the voters of Bibb County approved the bond issue by 50.8-percent of the vote.
 
 
 8
 On March 7, 1989, the three-judge court entered judgment for the School Board on the section 5 claims. Lucas v. Townsend, 732 F.Supp. 1581 (M.D.Ga.1989). On June 7, 1989, a single-judge district court denied the appellants' claim based on section 2 of the Act. The district court ruled that the Board's exercise of discretion in combining multiple projects in a single referendum rather than submitting them as four separate questions did not constitute a standard, practice, or procedure under section 2. Lucas v. Townsend, 714 F.Supp. 525 (M.D.Ga.1989).
 
 
 9
 On January 22, 1990 the Supreme Court summarily affirmed the judgment of the three-judge court denying relief for the section 5 claims. Lucas v. Townsend, --- U.S. ----, 110 S.Ct. 858, 107 L.Ed.2d 943 (1990).
 
 CONTENTIONS OF THE PARTIES
 
 10
 The appellants contend that the Supreme Court's summary affirmance of the three-judge court's denial of relief under section 5 does not constitute binding precedent regarding the legal issues presented in this section 2 claim. According to the appellants, the form and timing of the referendum constitutes a standard, practice, or procedure affecting voting within the meaning of section 2 of the Voting Rights Act. They further contend that the form of the referendum was intended to or had the effect of diluting the minority vote in violation of section 2 of the Act and in violation of the first, thirteenth, fourteenth, and fifteenth amendments.
 
 
 11
 The Board contends that the Supreme Court's summary affirmance is binding precedent which controls the outcome of this appeal. The Board also contends that the form of the referendum question on the ballot is not a voting qualification, prerequisite to voting, or standard, practice, or procedure with respect to voting pursuant to the Act. According to the Board, even if section 2 is applicable, the political processes leading to the formulation of the referendum question were equally open to African-Americans, and therefore, section 2 was not violated. All other constitutional claims were waived, the Board argues, through the appellants' failure to raise these claims in the pretrial conference on March 2, 1989, or in subsequent documents submitted to the district court.
 
 ISSUES
 
 12
 The issues are (1) whether the Supreme Court's summary affirmance of the denial of relief under section 5 constitutes binding precedent in this section 2 appeal, (2) whether the form of the referendum question is a standard, practice, or procedure within the meaning of section 2 of the Voting Rights Act, and (3) whether section 2 of the Act was violated in this case.
 
 DISCUSSION
 I. Summary Affirmance
 
 13
 When the Supreme Court summarily affirms without opinion, it affirms the judgment, but not necessarily the court's reasoning supporting the judgment. Mandel v. Bradley, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977). Any question which it clearly decides in affirming the judgment is binding on all other courts faced with the same issue. Hicks v. Miranda, 422 U.S. 332, 344-45, 95 S.Ct. 2281, 2289-90, 45 L.Ed.2d 223 (1975). Thus, the threshold question is whether the Supreme Court necessarily decided that the form of a bond referendum question is not "a standard, practice, or procedure affecting voting" pursuant to section 5.
 
 
 14
 The three-judge court denied relief on the merits of the section 5 claims, citing the same reasons it gave earlier in its opinion denying preliminary injunctive relief under section 5.[4] In that opinion, the court gave the following two reasons for its decision:First, Georgia school boards before November 1, 1964, were authorized to and had exercised their discretion in formulating questions for bond referendums. The exercise of discretion by the Bibb County School Board was thus no change. Second, the form or structure of a question on a bond referendum is not a standard, practice, or procedure affecting voting. The discretionary decision to submit one or more questions to the electorate is one properly left to the political process.
 
 
 15
 Lucas v. Townsend, 698 F.Supp. 909, 912 (M.D.Ga.1988).
 
 
 16
 The School Board contends that the Supreme Court's summary affirmance of this ruling is binding precedent on whether the form of a referendum is a standard, practice, or procedure pursuant to section 2.[5] The appellants argue that the two alternative reasons for the Supreme Court's affirmance prevent it from controlling this section 2 case. Under the first basis for its affirmance, the Court may have simply agreed that the exercise of discretion in formulating questions for bond referendums does not constitute a "change" under section 5. Section 5, requiring preclearance by the Attorney General, only applies to proposed changes in voting procedures enacted after November 1, 1964. 42 U.S.C.A. Sec. 1973c (West 1981); see Lucas v. Townsend, 698 F.Supp. at 911. If the Supreme Court agreed with this rationale, it did not have to reach the second basis for the opinion, whether the form of a bond referendum question is a standard, practice, or procedure affecting voting.
 
 
 17
 We agree with the appellants that because two reasons exist for the Supreme Court's affirmance, it did not necessarily decide the issue of whether the form of a bond referendum question is a standard, practice, or procedure affecting voting. The Supreme Court may have agreed with the three-judge court that the decision to combine multiple projects in a bond referendum did not constitute a change under section 5. Georgia law allows school boards to combine more than one project in a referendum. See Miles v. State, 96 Ga.App. 610, 614, 101 S.E.2d 173, 176 (1957) (bond referendum combining several school funding projects held to constitute "one proposition" as required by state statute); see also Ga.Code Ann. Sec. 36-82-1 (Michie Supp.1989). Therefore, we hold that the Supreme Court's summary affirmance does not constitute binding precedent on the issue of whether the form of a referendum is a standard, practice, or procedure within the meaning of section 2.[6]
 
 
 18
 II. "Standard, Practice, or Procedure" Under Section 2
 
 
 19
 Section 2 of the Voting Rights Act of 1965 provides that
 
 
 20
 [n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any state or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantee set forth in section 1973b(f)(2) of this title, as provided in subsection b of this section.
 
 
 21
 42 U.S.C.A. Sec. 1973(a) (West Supp.1990). "The essence of a Sec. 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Thornburg v. Gingles, 478 U.S. 30, 47, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986). All citizens enjoy the right to a properly weighted and counted vote encompassing both "votes cast with respect to candidates for public or party office and propositions for which votes are received in an election." 42 U.S.C.A. Sec. 1973l(c)(1) (West 1981). Thus, bond referendums, which are a form of proposition, fall within the express language of the Act. The question remaining, as a matter of first impression, is whether combining multiple bond projects in a single referendum constitutes a standard, practice, or procedure which has the potential of resulting in the denial or abridgement of the right to vote on account of race.
 
 
 22
 The phrase "standard, practice, or procedure" appears in section 2 and section 5 of the Act. In the following discussion, we examine the Supreme Court's interpretation of this phrase in both sections to determine its scope. In Allen v. State Board of Elections, 393 U.S. 544, 567, 89 S.Ct. 817, 832, 22 L.Ed.2d 1 (1969), the Court held that the phrase must be given the "broadest possible scope." Based on the legislative history of Congress' intent, the Court concluded that "the Act gives a broad interpretation to the right to vote, recognizing that voting includes 'all action necessary to make a vote effective.' " Allen, 393 U.S. 544, 565-66, 89 S.Ct. 817, 832 (citations omitted). In Allen, the Court held that a change from district to at-large voting for county supervisors constituted a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" within the meaning of section 5. The Court also held that the decision to make certain offices appointive instead of elective fell within the meaning of section 5.
 
 
 23
 In Dougherty County, Georgia, Board of Education v. White, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978), the Court held that a local school board's rule regarding leave without pay for employees while they sought elected office and while they served in that capacity was "a standard, practice, or procedure" affecting voting within the meaning of section 5. The Court reasoned that the rule was not a neutral personnel practice governing all forms of absenteeism, but rather a type of filing fee. "By imposing substantial economic disincentives on employees who wished to seek elective office, the rule burdens entry into elective campaigns and, concomitantly limits the choices available to Dougherty County voters." 439 U.S. at 40, 99 S.Ct. at 373.
 
 
 24
 In response to the Court's ruling, the local school board eliminated the policy requiring leave without pay for employees seeking political office, instituting instead a neutral employee policy limiting leave without pay to case-by-case consideration. The Court subsequently affirmed the three-judge court's holding that individual personnel decisions regarding an employee's request for leave without pay to serve in an elected capacity was not "a standard, practice, or procedure with respect to voting." White v. Dougherty County Board of Education, 579 F.Supp. 1480 (M.D.Ga.1984), aff'd, 470 U.S. 1067, 105 S.Ct. 1824, 85 L.Ed.2d 125 (1985). Cf. NAACP v. Hampton County Election Commission, 470 U.S. 166, 178, 105 S.Ct. 1128, 1135, 84 L.Ed.2d 124 (1985) (change need not be likely to be repeated; "Voting Rights Act reaches changes that affect even a single election.").
 
 
 25
 While section 5 requires preclearance for changes in voting practices in covered jurisdictions, section 2 forbids practices which abridge the right to vote on account of race in any jurisdiction. The right to vote may be abridged through the dilution of voting strength. Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964). Challenges to at-large voting schemes consistently have been held to fall within the meaning of section 2 because of their potential for diluting the effectiveness of the minority vote. See, e.g., Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); Solomon v. Liberty County, Florida, 899 F.2d 1012 (11th Cir.1990); United States v. Dallas County Commission, 850 F.2d 1433 (11th Cir.1988). The courts have also held that a "standard, practice, or procedure" within the meaning of section 2 can include the appointment of poll officials and the selection of polling places. See United States v. Marengo County Commission, 731 F.2d 1546, 1552-53 (11th Cir.1984) (appointment of poll officials); Perkins v. Matthews, 400 U.S. 379, 387, 91 S.Ct. 431, 436, 27 L.Ed.2d 476 (1971) (location of polling place). In Perkins, the Court held that locating polling places distant from African-American communities or at places calculated to intimidate them from entering was a practice or procedure which violated the Act. "The abstract right to vote means little unless the right becomes a reality at the polling place on election day." Perkins v. Matthews, 400 U.S. at 387, 91 S.Ct. at 436.
 
 
 26
 We begin our analysis by noting that the views of the Attorney General regarding the scope of section 5 of the Act are entitled to deference. Dougherty County, Georgia, Board of Education v. White, 439 U.S. at 39, 99 S.Ct. at 372. We do not afford the Attorney General's interpretation of section 5 the same deference in resolving claims under section 2, however, because that section does not involve the Attorney General. In the amicus brief submitted on behalf of the United States to the three-judge court, the Attorney General stated that "[i]t is unquestioned that the 'method of offering issues and propositions for approval by referendum' is ... a standard, practice, or procedure that, if changed, is subject to section 5 review." (Citing 28 C.F.R. Sec. 51.13(j).) The Attorney General, nevertheless, stated the following reasons for not requiring preclearance for the Board's choice of how to frame the referendum:
 
 
 27
 Here, the facts of the record would tend to suggest that the defendants' discretionary decision to present the voters with a single vote on the entire bond project is not the kind of change subject to preclearance. Selecting a number of projects to be financed under one bonding authority would seem to be a normal legislative decision unrelated to the process of holding elections. It is essentially the same kind of determination as the amount of bonded indebtedness required for a project, the interest rate the Board is willing to pay, or the term of the bonds.
 
 
 28
 We cannot agree that the decision to group multiple projects into one referendum is analogous to the decision of how much money to spend on a project, or what interest rate should be paid on the bonds. How the Board presents projects to the voters, whether as single-issue or multiple-issue referendums, becomes a political decision with the potential for diluting or submerging the minority vote as prohibited by section 2. As the Attorney General acknowledges, the Voting Rights Act is designed to assure equal opportunity for the minority to express its political will whether in the election of the candidate of their choice or in voting for the proposition of their choice. By combining projects in one referendum, the Board forced minority voters supporting one project to either vote in favor of other projects they might not support, to abstain from voting, or to vote against the project they supported. Their political will to defeat certain propositions is effectively diluted or submerged by the combination of multiple projects in a single referendum. See Rea v. City of Lafayette, 130 Ga. 771, 61 S.E. 707, 708 (1908) ("[t]o present [two] propositions in a single submission, thus rendering the success of one dependent upon the success of the other, or the defeat of one on the defeat of the other, is clearly unfair to the voters....").
 
 
 29
 The district court concluded that the Board's decision to group all four bond projects into a single referendum was not "a standard, practice, or procedure" pursuant to section 2. The district court reasoned that the Board's discretionary, deliberative process did not address the right to vote as protected by the Act.
 
 
 30
 [T]his court determines that the exercise of discretion by validly elected local board officials in determining the number of questions to be submitted to the electorate for its approval or disapproval at the ballot box is not a standard, practice, or procedure. Alternatively, the court finds that even if such exercise of discretion was a standard, practice, or procedure, such practice does not affect voting. The manner in which the proposal was structured had and has absolutely no bearing upon the qualification of any individual to vote, the ability of any individual to register to vote, the opportunity of any individual to cast his or her vote, or the manner in which any individual's vote was tabulated.
 
 
 31
 Lucas v. Townsend, 714 F.Supp. 525, 534 (M.D.Ga.1989) (emphasis added).
 
 
 32
 Although this practice may not be the kind of change subject to preclearance under section 5, we hold that it is "a standard, practice, or procedure" that has the potential for abridgement of the right to vote on account of race. Minority communities have the right to vote for or against the propositions of their choice just as they have the right to a fully effective vote to elect candidates of their choice. The practice of combining separable referendum issues into a single question may work to abridge minority voting rights as certainly as the policy concerning leaves of absence for employees running for public office, the appointment of polling officials, and the location of the polls. In the proper case, this practice could dilute a minority vote as effectively as anti-single shot voting procedures and straight ticket voting requirements. See City of Rome v. United States, 446 U.S. 156, 184-85 n. 19, 21, 100 S.Ct. 1548, 1565 n. 19, 21, 64 L.Ed.2d 119 (1980) (anti-single shot voting practices described); Dunston v. Scott, 336 F.Supp. 206, 211 (E.D.N.C.1972) (anti-single shot law requires voter to vote for all available seats even though voter would prefer to vote for fewer seats); Hendon v. North Carolina State Board of Elections, 710 F.2d 177, 180 (4th Cir.1983) (straight ticket vote counting that did not count split ticket votes unconstitutional).
 
 
 33
 Our holdings do not have any far reaching impact on the manner in which public bodies in Georgia may offer propositions to the voters. Section 5 is not affected by our holding. Since Georgia law presently allows multiple propositions to be presented in a single referendum, continuing this practice will not constitute a change; thus, the Attorney General will not be required to preclear the proposition. See Lucas v. Townsend, 732 F.Supp. 1581 (M.D.Ga.1989), aff'd, --- U.S. ----, 110 S.Ct. 858, 107 L.Ed.2d 943 (1990). As to the effect of our holding on section 2, multiple propositions presented in a single referendum will be subject to litigation; but, so are all referendum propositions that allegedly discriminate against minorities.
 
 III. The Violation of Section 2
 
 34
 We do not reach the merits of the appellants' section 2 claim because the district court did not rule on the "results" aspect of this case. Therefore, we remand this case to the district court for the determination of whether section 2 has been violated.[7]
 
 CONCLUSION
 
 35
 We hold that the Supreme Court's summary affirmance on the appellants' section 5 claim does not constitute binding precedent as to the issue in this case. We further hold that the form or structure of a referendum question is "a standard, practice, or procedure" within the meaning of section 2 of the Voting Rights Act of 1965. We remand to the district court for further proceedings consistent with this opinion.
 
 
 36
 REVERSED and REMANDED.
 
 RONEY, Senior Circuit Judge, dissenting:
 
 37
 I respectfully dissent for the reasons stated in the opinion of the district court, which I would affirm. Lucas v. Townsend, 714 F.Supp. 525 (M.D.Ga.1989).
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable Thomas E. Fairchild, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 Title 42 U.S.C. Sec. 1973c requires preclearance by the Attorney General of changes in voting practices in certain, covered jurisdictions. In 1965, the Attorney General designated Georgia a covered jurisdiction under the Act. See City of Rome v. United States, 446 U.S. 156, 161, 100 S.Ct. 1548, 1553, 64 L.Ed.2d 119 (1980)
 By regulation, the discretionary choice of a date for a special election such as a referendum is subject to the preclearance requirement. 28 C.F.R. Sec. 51.17(b) (1987).
 
 
 [2]
 "Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court." 42 U.S.C.A. Sec. 1973c (West 1981)
 
 
 [3]
 "Any change affecting the ... methods for offering issues and propositions for approval by referendum" is subject to preclearance. 28 C.F.R. Sec. 51.13(j) (1987) (emphasis added)
 
 
 [4]
 The parties having stated at a pretrial conference held on March 2, 1989, before the originating judge that they do not desire to present further evidence or briefs on the issues required to be heard by this 28 U.S.C. Sec. 2284 court of three judges, this court of three judges, for the reasons set forth in its order of November 2, 1988, [Lucas v. Townsend, 698 F.Supp. 909 (M.D.Ga.1988) ] does hereby declare and adjudge that the decision of the defendant Bibb County Board of Education to submit a single twenty-nine million dollar bond issue by referendum to the voters of Bibb County, Georgia[,] rather than to submit four separate bond issues for the four categories of school improvements to be paid for by said bond issues, is not encompassed by Section Five of the Voting Rights Act of 1965, and therefore, did not have to be submitted to the Attorney General of the United States for Section Five preclearance
 Lucas v. Townsend, 732 F.Supp. 1581, 1581 (M.D.Ga.1989).
 
 
 [5]
 Section 5 of the Voting Rights Act of 1965, codified at 42 U.S.C. Sec. 1973c, requires preclearance by the Attorney General for changes of "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting...." 42 U.S.C.A. Sec. 1973c (West 1981) (emphasis added)
 Section 2 of the Voting Rights Act of 1965, codified at 42 U.S.C. Sec. 1973(a), provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race...." 42 U.S.C.A. Sec. 1973(a) (West Supp.1990) (emphasis added).
 
 
 [6]
 Because we decide that the Supreme Court did not necessarily reach this issue, we need not decide whether the phrase "standard, practice, or procedure" has the same meaning in section 2 and section 5
 
 
 [7]
 On remand, the district court should determine whether the appellants' failure to present the constitutional issues in the March 2, 1989 pre-trial conference resulted in a waiver of those issues. We note that the appellants' proposed Pre-trial Order filed February 28, 1989, listed claims based on the first, thirteenth, fourteenth, and fifteenth amendments