Mary **BONILLA; Rafael Boria; Neomi Hernandez; Ignacio Alvarez; Antonio Miranda; Peter Mendoza; Francisco Duprey, Plaintiffs,**

v.

The **CITY COUNCIL OF The CITY OF CHICAGO; City of Chicago Board of Elections Commissioners, and Michael J. Hamblet, Chairman; Richard M. Daley, Mayor, City of Chicago; Walter Kozubowski; City Clerk, City of Chicago, Defendants,**

and

Carole **Bialczak, Thomas Murphy, Patrick M. Huels, James Laski, Anthony C. Laurino, Ginger Rugai, Patrick J. Levar, John S. Madrzyk, Theodore Mazola, Lemuel Austin, Jr., Edwin Eisendrath, Edward Burke, William J.P. Banks, Bernard L. Stone, Eugene C. Schulter, John Buchanan, Mary Ann Smith, Brian Doherty, Ambrosio Medrano, Lorraine L. Dixon, Theris M. Gabinski, Ray Suarez, Burton F. Natarus, Bernard J. Hansen, Richard F. Mell, Thomas W. Cullerton, Mark Fary, Patrick J. O'Connor, and Michael J. Wojcik, Defendant Intervenors.**

No. 92 C 2666.

United States District Court, N.D. Illinois, E.D.

Dec. 21, 1992.

Arturo Jauregui, Ricardo Meza, Maria Valdez, Mexican American Legal Defense, Chicago, IL, for plaintiffs.

Kenneth L. Schmetterer, Kelly Raymond Welsh, Susan R. Lichtenstein, Andrew S. Mine, City of Chicago, Law Dept. Corp. Counsel, Chicago, IL, for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Unlike the other currently pending aldermanic remap cases (*Barnett v. Daley* and *Smith v. Daley*), the case at bar was brought by a group of Hispanic, registered voters in the City of Chicago. Although *Bonilla* was reassigned to this court on relatedness grounds, it has never been formally consolidated with either *Barnett* or *Smith*. Accordingly, the pending motion to dismiss *Bonilla* is addressed in this opinion, while the pending motions to dismiss *Barnett* and *Smith* are addressed in a separate opinion.

## BACKGROUND

In 1980, the City of Chicago had a total population of 3,005,075, of which 1,299,557 (43.2%) were Caucasian, 1,197,000 (39.8%) were African–American, and 422,063 (14%) were Hispanic. P.2d.A.Comp., ¶ 21. During the 1980's, Chicago's total population fell to 2,783,726, but Chicago's Hispanic community grew substantially. P.2d.A.Comp., ¶ 23. As a result, according to the 1990 Census, Hispanics presently constitute 19.6% of Chicago's total population, while Caucasians and African–Americans each constitute approximately 38% of the total population. P.2d.A.Comp., ¶ 23.

By law, the Chicago City Council was required to redistrict Chicago's 50 wards pursuant to the 1990 Census by December 1, 1991. Ill.Rev.Stat. ch. 24, ¶ 21–38. Since the City Council failed to do so, Illinois law provided that any ten Chicago aldermen could propose a redistricting ordi-

nance and have it put before the voters at a popular referendum. Ill.Rev.Stat. ch. 24, ¶ 21–40.

Pursuant to the redistricting "default" procedure, on October 28, 1991, all four Hispanic aldermen proposed a redistricting ordinance which provided for nine majority Hispanic wards. Although this ordinance was not ultimately placed on the ballot, two alternative redistricting ordinances were ultimately proposed and placed on the ballot. One of the ordinances was sponsored by certain African–American aldermen, while the other was offered by twenty eight aldermen supporting Mayor Richard Daley on this issue.

On March 17, 1992, the map proposed by the latter group (hereinafter, the "March 1992 Map") was selected by the voters, and it provides for seven majority Hispanic wards (14% of the total number of wards in Chicago).

The *Bonilla* Plaintiffs challenge both the March 1992 Map and the process through which it was selected. First, the *Bonilla* Plaintiffs allege that the March 1992 Map "fractures" Hispanic communities (i.e., splits them into more than one district with the result that Hispanic voters constitute an ineffective grouping in each) in violation of the 14th Amendment, the 15th Amendment, 42 U.S.C. § 1983, and § 2 of the Voting Rights Act. Second, the *Bonilla* Plaintiffs allege that the redistricting process itself violates § 2 of the Voting Rights Act, since there are not enough Hispanic aldermen to propose a redistricting ordinance, even though Hispanics constitute approximately 20% of Chicago's population. Finally, the *Bonilla* Plaintiffs allege that because the March 1992 Map went into effect immediately upon its selection by the voters, there are presently two wards without a resident alderman. The *Bonilla* Plaintiffs therefore allege that vacancies exist in these wards, and that these vacancies must be filled through special elections which the Defendants refuse to hold. According to the *Bonilla* Plaintiffs, this refusal violates both Illinois law and the Voting Rights Act.

Defendants have filed a motion to dismiss the entire Second Amended Complaint. For the reasons discussed below, it is hereby granted in part and denied in part.

## DISCUSSION

■ The standard governing this court's decision on a Rule 12(b)(6) motion is well established. Only if the allegations in the complaint, and all reasonable inferences drawn therefrom, could not support any cause of action may this court grant the motion. See generally Charles Wright & Arthur Miller, 5A *Federal Practice and Procedure:* Civil 2d § 1357 (West Publishing, 2d ed. 1990). The court, however, need not strain to find inferences favorable to a plaintiff which are not apparent on the face of the complaint. *Coates v. Illinois State Board of Education*, 559 F.2d 445, 447 (7th Cir.1977). The court must nevertheless interpret ambiguities in the complaint in favor of a plaintiff, and a plaintiff is free, in defending against a motion to dismiss, "to allege without evidentiary support any facts he pleases that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved ... would entitle him to judgment." *Early v. Bankers Life and Casualty Co.*, 959 F.2d 75, 79 (7th Cir.1992).[1]

A. *The Bonilla Plaintiffs' Claim that the March 1992 Map Violates the Voting Rights Act (Count 1).*

■ Section 2(a) of the Voting Rights Act makes it illegal to deny or abridge, on account of race, any person's right to vote. 42 U.S.C. § 1973(a). Section 2(b), as amended in 1982, adds that a violation of § 2(a) occurs

if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election ... are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its

members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b) (emphasis in original). Congress amended § 2 in 1982 so as to define Voting Rights Act violations in terms of discriminatory outcome, not intent. *Thornburg v. Gingles*, 478 U.S. 30, 35, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986). As a result, § 2 violations can be proven "by showing discriminatory effect alone", rather than having to show a discriminatory purpose. *Id.* at 35, 106 S.Ct. at 2758.

■ At the same time, however, § 2(b) says that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). This proviso unequivocally disclaims a right to proportional representation. *Gingles*, 478 U.S. at 84, 106 S.Ct. at 2784 (O'Connor, J., concurring in judgment); *Baird v. Cons. City of Indianapolis*, 976 F.2d 357, 359 (7th Cir.1992).

■ To establish a § 2(b) violation, a minority group must prove, at a minimum, that it satisfies the following threshold requirements: 1) that it is sufficiently large and geographically compact to make up a majority in a properly drawn district; 2) that it is politically cohesive; and 3) that racial bloc voting typically frustrates the election of the minority group's preferred candidate. *Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766–2767; *Baird*, 976 F.2d at 359. "Proof along these lines is not enough, however, if other considerations show that the minority has an undiminished right to

---

1. Because this is a motion to dismiss which the court does not wish to convert into a premature summary judgment motion, all exhibits attached to the parties' various briefs are hereby excluded.

participate in the political process." *Baird,* 976 F.2d at 359.

█ In the case at bar, the Defendants allege that the *Bonilla* Plaintiffs' Voting Rights Act claim against the March 1992 Map fails to state a claim. Specifically, the Defendants allege that the *Bonilla* Plaintiffs fail to adequately plead the *Gingles* criteria and that their claim is nothing more than an inappropriate vote maximization request.

With regard to the adequacy of the *Gingles* allegations, the court notes as a preliminary matter, that it must liberally construe the *Bonilla* Plaintiffs' allegations since this is a motion to dismiss. Accordingly, dismissal will only be appropriate if the allegations in the complaint, and all reasonable inferences drawn therefrom, could not satisfy the *Gingles* criteria. Under this liberal standard, the court finds that the *Bonilla* Plaintiffs' *Gingles* allegations are sufficient to withstand a motion to dismiss.

The first *Gingles* criterion is sufficient size and geographic compactness to constitute a majority in a properly drawn district. In satisfaction of this requirement, the *Bonilla* Plaintiffs allege that while the March 1992 Map establishes seven majority Hispanic wards, the Hispanic population is sufficiently large and geographically compact to constitute the majority in one or two additional wards. Moreover, the *Bonilla* Plaintiffs also allege that Hispanics presently constitute approximately 19.6% of the total population in Chicago, and that under the March 1992 Map, the Hispanic population is fractured on the near south side (where another Hispanic majority ward allegedly could be created), and is diluted and fractured on the near north side.

The second *Gingles* criterion is political cohesiveness. In satisfaction of this requirement, the *Bonilla* Plaintiffs allege that "Hispanic electoral candidates" and "the political aspirations of the Latino community" have been damaged by racially polarized voting in the past. The *Bonilla* Plaintiffs also allege that the March 1992 Map denies "Hispanic voters the ability to influence the outcome of City Council aldermanic elections." Both of these assertions imply Hispanic political cohesiveness, and therefore satisfy the second *Gingles* criterion.

The final *Gingles* criterion is an allegation of racial bloc voting which typically frustrates the minority group's preferred candidate. In satisfaction of this requirement, the *Bonilla* Plaintiffs allege that racially polarized voting has historically penalized Hispanic electoral candidates. They also allege that while Hispanics presently constitute approximately 20% of the total population in Chicago, only four of the fifty aldermanic seats (8%) are currently held by Hispanics. Additionally, the *Bonilla* Plaintiffs point out that Hispanic Chicagoans were found to have been discriminated against after the 1980 Census. Based upon the foregoing, and all reasonable inferences drawn therefrom, the court finds that the Second Amended Complaint adequately alleges racial bloc voting. For purposes of a motion to dismiss, the *Bonilla* Plaintiffs therefore satisfy all of the *Gingles* threshold requirements.

As Defendants accurately point out, however, merely satisfying the *Gingles* threshold requirements is not enough to establish a § 2 violation, "if other considerations show that the minority has an undiminished right to participate in the political process." *Baird,* 976 F.2d at 359. For example, in *Baird,* the Seventh Circuit held that in the absence of intentional discrimination, a minority group that has representation proportional to its percentage of the population does not have a claim under § 2. *Id.* at 360. Unlike the situation in *Baird,* however, Hispanic Chicagoans are not proportionately represented under the March 1992 Map. Furthermore, because this is a motion to dismiss, the scope of the court's analysis is limited to the complaint and any facts alleged by the *Bonilla* Plaintiffs in support of the complaint. *Early,* 959 F.2d at 79. Thus, regardless of what Defendants may eventually be able to prove under a "totality of the circumstances" argument (e.g., whether or not this is merely an inappropriate vote maximization request),

the allegations presently before the court do not show that Hispanics have an "undiminished right to participate in the political process." *Baird*, 976 F.2d at 359. These allegations do, however, state a legitimate fracturing claim under § 2 of the Voting Rights Act. Accordingly, the court denies Defendants' motion to dismiss the *Bonilla* Plaintiffs Count 1 Voting Rights Act challenge to the March 1992 Map.

### B. *The Bonilla Plaintiffs' Claim that the Redistricting Process Itself Violated the Voting Rights Act (Count 1).*

■ The *Bonilla* Plaintiffs assert that the method through which the March 1992 Map was ultimately selected violated the Voting Rights Act. Specifically, the *Bonilla* Plaintiffs allege that the "ten aldermen requirement" (the requirement that at least ten aldermen support a proposed redistricting ordinance before it can be submitted for voter approval) has a discriminatory impact on minorities.

Though seemingly plausible, this argument is without support in the plain words of the statute,[2] and no court has ever construed the Voting Rights Act as prohibiting the use of any particular *method* of redistricting. Courts have, however, consistently held that legislative bodies have the power to reapportion themselves. *Reynolds v. Sims*, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964) ("legislative reapportionment is primarily a matter for legislative consideration and determination"); *Dickinson v. Indiana State Election Bd.*, 933 F.2d 497, 501 (7th Cir.1991) ("the legislature has constitutional authority for apportionment"). Moreover, courts have also consistently held that even after a violation of § 2 of the Voting Rights Act is found, a court "can permit or even order the legislature to submit a proposed reme-

dy." *Dickinson*, 933 F.2d at 501. *See also*, *McGhee v. Granville County*, 860 F.2d 110, 115 (4th Cir.1988) ("[w]here, as here, a court has properly given the appropriate legislative body the first opportunity to devise an acceptable remedial plan ... the court's ensuing review and remedial powers are largely dictated by the legislative body's response").

■ Since legislatures operate under majority rule principles, requiring a majority of legislators to approve a particular redistricting plan is clearly permissible under the Voting Rights Act. Indeed, the *Bonilla* Plaintiffs do not even suggest that they could challenge a statutory procedure which allowed a majority of the City Council to approve a redistricting ordinance. The *Bonilla* Plaintiffs nevertheless challenge the "ten aldermen requirement," which is substantially less than a majority requirement.

In support of their position, the *Bonilla* Plaintiffs cite *Presley v. Etowah County Com.*, —— U.S. ——, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992). In *Presley*, the Supreme Court held that the Voting Rights Act applies only to a "standard practice or procedure" that has a "direct relation to, or impact on, voting." *Id.*, —— U.S. at ——, 112 S.Ct. at 830. Specifically, the Supreme Court held that a change in the authority of elected officials did not *directly* affect the right to vote and therefore was not subject to the Voting Rights Act:

> [c]hanges which affect only the distribution of power among officials are not subject to § 5 because such changes have no direct relation to, or impact on, voting.

*Id.* at ——, 112 S.Ct. at 830.[3]

As examples of changes that do have a direct effect on voting (and, hence, fall

---

**2.** Section 2(a) of the Voting Rights Act provides as follows: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color ..." 42 U.S.C. § 1973(a).

**3.** Although *Presley* technically dealt with the scope of § 5 of the Voting Rights Act (which requires preclearance of changes in voting procedures in certain states other than Illinois), it is equally applicable to § 2 because *Presley* defined the key terms in both sections: "voting qualification or prerequisite to voting, or standard, practice, or procedure" with respect to

within the preclearance requirements of § 5 of the Voting Rights Act), the Supreme Court listed four basic categories, and gave precise examples of each: 1) manner of voting restrictions (e.g., location of polling places); 2) candidacy requirements and qualifications (e.g., filing deadlines, and requirements that board of education members take unpaid leaves while campaigning for office); 3) the composition of the electorate that may vote for candidates for a given office (e.g., single member vs. multi-member districts and district boundaries); 4) the actual creation or abolition of elective offices (e.g., appointed vs. elected officials). *Id.* at —, 112 S.Ct. at 828. Each of these examples "has a direct relation to voting and the election process." *Id.* at — – —, 112 S.Ct. at 828–829.

In the case at bar, the "ten aldermen requirement" affects the distribution of power among the aldermen on the City Council and hence, it *indirectly* affects the voting power of their constituents. The "ten aldermen requirement" does not, however, *directly* relate to voting by Hispanic voters at-large.[4] According to *Presley*, it is therefore not a standard, practice, or procedure covered by the Voting Rights Act. If it were, the well-established right of legislative bodies to reapportion themselves could not exist, since legislative self-reapportionment inherently involves majority rule.

The additional cases cited by the *Bonilla* Plaintiffs also do not support expansion of the Voting Rights Act to redistricting methods. First, the *Bonilla* Plaintiffs misinterpret *Kendrick v. Walder*, 527 F.2d 44 (7th Cir.1975). In *Kendrick*, the Seventh Circuit stated that "if, as a result of the method of apportionment, the group is disadvantaged in its use of the ballot, an equal protection claim may exist." *Id.* at 48. The *Bonilla* Plaintiffs interpret this to mean that the method of reapportionment may create an equal protection claim. In reality, the term "method of apportionment" as used in *Kendrick* was referring

voting. *See* 42 U.S.C. § 1973(a) and 42 U.S.C. § 1973c.

to the apportionment of aldermanic seats through single-member as opposed to multi-member districts, and not to the process of drawing new district boundary lines. Second, the *Bonilla* Plaintiffs' interpretation of *Hernandez v. Woodard*, 714 F.Supp. 963 (N.D.Ill.1989) is inaccurate. Contrary to the *Bonilla* Plaintiffs' assertion, in *Hernandez*, this court did not hold "that the failure to appoint sufficient numbers of bilingual deputy registrars constitutes a practice or procedure within the meaning of the Voting Rights Act." Response at 16. Rather, as noted by this court in *Hernandez*, "[f]or the purposes of this motion, the defendant does not quarrel with the plaintiff's characterization of the limit on deputy registrars as a standard, practice, or procedure within § 2." *Hernandez*, 714 F.Supp. at 968. The court therefore never ruled on the issue. Third, the *Bonilla* Plaintiffs cite *Allen v. State Board of Elections*, 393 U.S. 544, 567, 89 S.Ct. 817, 832, 22 L.Ed.2d 1 (1969) for the proposition that the term "standard, practice, or procedure" should be given the "broadest possible scope." That statement in *Allen*, however, is clearly modified by *Presley*.

Lastly, the *Bonilla* Plaintiffs cite *Lucas v. Townsend*, 908 F.2d 851 (11th Cir.1990), for the proposition that the form and timing of a referendum proposal is actionable under the Voting Rights Act. First, it must be noted that this is a pre-*Presley*, Eleventh Circuit case. Second, *Lucas* is merely about "whether the *form* of the referendum *question* is a standard, practice, or procedure within the meaning of section 2 of the Voting Rights Act." *Id.* at 854 (emphasis added). The *Bonilla* Plaintiffs are not challenging the form of the March 17, 1992 referendum proposals. Rather, the *Bonilla* Plaintiffs are challenging a rule governing the internal operation of the City Council which only indirectly had any impact on voting. *Lucas* therefore also does not support the *Bonilla* Plain-

4. Indeed, as the *Bonilla* Plaintiffs concede in their response, three out of the four Hispanic aldermen ultimately supported the March 1992 Map. Response at 16, n. 8.

tiffs' desire to extend the Voting Rights Act to cover particular methods of reapportionment.

Accordingly, the *Bonilla* Plaintiffs Voting Rights Act challenge to the "ten aldermen requirement" in Count 1 is dismissed.

C. *The Bonilla Plaintiffs Claim That Aldermanic "Vacancies" Created by Implementation of the March 1992 Map Violate Both the Voting Rights Act and Illinois Election Law (Count 2).*

The *Bonilla* Plaintiffs contend that the March 1992 Map became effective immediately upon its adoption, and that the ward boundaries changed accordingly at that time.[5] As a result, in two wards (both of which are majority Hispanic), there is no resident alderman. Under Illinois law, a "vacancy occurs in the office of alderman by reason of ... removal from office or of residence from the ward." Ill.Rev.Stat., ch. 24, ¶ 3–4–14. The *Bonilla* Plaintiffs therefore assert that there are aldermanic "vacancies" in these wards, and that such vacancies must be filled in accordance with state election law.[6] The Chicago City Clerk, however, has refused to certify these vacancies to the Board of Elections, and the *Bonilla* Plaintiffs allege that this refusal violates both the Voting Rights Act and state election law.

As discussed above, the Voting Rights Act prohibits "practices" or "procedures" which deny or abridge the right of any citizen to vote on account of race or color. 42 U.S.C. § 1973(a). A Voting Rights Act violation is established if "it is shown that the processes leading to election in the relevant political subdivision are not equally open to participation by members of a given class of citizens." *Political Action Conference of Illinois v. Daley*, 976 F.2d 335, 340 (7th Cir.1992) (hereafter, "*PACI*").

In *PACI*, the Seventh Circuit expressly held that, under the Voting Rights Act, the 1991 Chicago aldermanic elections could be conducted using existing wards and that the aldermen elected in 1991 could serve their full four-year terms:

[t]he four-year terms that Chicago aldermen serve merely indicate that every fifth election (i.e. when the election year falls on the same year that the new census data becomes available) likely will result in a four-year delay in using the new census data. But this simple consequence of the two different schedules (i.e. census every ten years, elections every four) does not diminish the voting power of any protected minority; there is merely a four-year time lag that occurs every other decade between redistricting and election.

*Id.* at 341. In so holding, the Seventh Circuit explained that the importance of redistricting every ten years and mathematical equality in representation is outweighed by considerations such as " 'the validity of four-year terms, the settled expectations of voters and elected officials, the costs of elections, and the need for stability and continuity of office.' " *Id.* at 341, quoting *French v. Boner*, 963 F.2d 890, 891 (6th Cir.1992).

By explicitly holding that Illinois' redistricting scheme did not violate the Voting Rights Act, and stressing the importance of stability and continuity of office, *PACI*, by itself, conceivably precludes the *Bonilla* Plaintiffs' claim. However, this court need not even rely on *PACI*, in light of the Supreme Court's recent *Presley* decision.

**5.** Ill.Rev.Stat., ch. 24, ¶ 21–42 provides that the redistricting "ordinance for which the highest number of vote is cast shall be deemed approved and shall thereupon be in force and effect."

**6.** Ill.Rev.Stat., ch. 24 ¶ 3–2–7 states: "Except as otherwise provided in this code, whenever a vacancy occurs in any elective municipal office, with at least 28 months remaining in a 4–year term, and the vacancy occurs at least 130 days before the next scheduled general municipal election as provided in the general election law, the office shall be filled for the remainder of the term at that general municipal election ... Whenever an election is held for this purpose, the municipal clerk shall certify the office to be filled and the candidates therefor to the proper election authorities as provided in the general election law."

In *Presley*, as discussed above, the Supreme Court explained that the Voting Rights Act only applies to practices or procedures that have a "direct relation to, or impact on, voting." *Presley*, — U.S. at —, 112 S.Ct. at 830. In the case at bar, the *Bonilla* Plaintiffs do not allege that any voter in the "vacant" wards was deprived of his right to participate in the 1991 aldermanic elections, nor do the *Bonilla* Plaintiffs allege that any voter in these wards will be deprived of the right to participate in the upcoming aldermanic elections or, for that matter, any other election. Under *Presley*, therefore, the *Bonilla* Plaintiffs do not have a claim under the Voting Rights Act as a result of the alleged aldermanic vacancies. They may nevertheless have a legitimate state law claim.

Pursuant to 28 U.S.C. § 1367, this court has supplemental jurisdiction over such a state law claim if it forms "part of the same case or controversy" as the *Bonilla* Plaintiffs' other claims. Claims are part of the same case or controversy if they "derive from a common nucleus of operative fact" such that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

In counts 1 and 3 of the case at bar, the *Bonilla* Plaintiffs are challenging, under the Voting Rights Act and the U.S. Constitution, the validity of the March 1992 Map and the process used to adopt that map (the process challenge is dismissed, *supra*). In count 2, following dismissal of the count 2 Voting Rights Act claim, the *Bonilla* Plaintiffs are merely alleging that the Chicago City Clerk is violating state election law by refusing to certify vacancies in two wards. This claim does not derive from a "common nucleus of operative fact" as counts 1 and 3, and is therefore not part of the same case or controversy. Accordingly, the court lacks supplemental jurisdiction over it.

When a court does have supplemental jurisdiction, it may nevertheless decline to exercise it if "the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). *See, e.g., Hernet v. Unknown Guards*, 1992 WL 249644, 1992 U.S.Dist.Lexis 14563 (N.D.Ill. September 25, 1992) (novel question of Illinois tort law dismissed pursuant to § 1367(c)(1)).

In the case at bar, no court has ever addressed the issue of whether the enactment of a redistricting ordinance pursuant to the Illinois statutory scheme can create mid-term aldermanic vacancies. Because this question is a novel question best addressed by a state court, even if this court had supplemental jurisdiction, it would decline to exercise it pursuant to § 1367(c)(1).[7]

Accordingly, the motion to dismiss count 2 is granted.[8]

D. *The Bonilla Plaintiffs' Claim that the March 1992 Map Violates the 14th Amendment, the 15th Amendment, and § 1983 (Count 3).*

To prevail on a claim based upon either the 14th or 15th Amendments, a plaintiff must allege and prove the existence of discriminatory intent on the part of the defendant. *Mobile v. Bolden*, 446 U.S. 55, 62, 66, 100 S.Ct. 1490, 1497, 1499, 64 L.Ed.2d 47 (1980); *Ketchum v. Byrne*, 740 F.2d 1398, 1403 (7th Cir.1984). Consequently, to establish that a particular reapportionment plan violates either the 14th or 15th Amendments, a plaintiff must plead and prove that the plan was conceived or operated as a purposeful device to further racial discrimination. *Bolden*, 446 U.S. at 62–66, 100 S.Ct. at 1497–1499.

---

**7.** If it chose to do so, the court could also abstain from deciding this issue under common law abstention doctrines. *See, e.g., Property and Casualty Ins., Ltd. v. Central Nat. Ins. Co.*, 936 F.2d 319, 322 (7th Cir.1991) (*Burford v. Sun Oil Company*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) abstention allows the federal court to "abstain from deciding difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the present case").

**8.** The *Bonilla* Plaintiffs' amended motion for preliminary injunctive relief is therefore moot.

The Seventh Circuit, moreover, has recently held that discriminatory effect alone does not establish unconstitutional discrimination:

> the only discrimination forbidden by these provisions [the 14th Amendment equal protection clause and the 5th Amendment due process clause] is *intentional* discrimination. Disparate impact, which means the unintended consequence of measures adopted for reasons unrelated to any intention to discriminate, is not, under the Supreme Court's current interpretation of the Constitution, an acceptable basis for a finding of *unconstitutional* discrimination, whatever the significance of such a showing may be under the civil rights statutes.

*Tucker v. U.S. Dept. of Commerce*, 958 F.2d 1411, 1413–1414 (7th Cir.1992) (emphasis in original). *See, also, Illinois Legislative Redistricting Com. v. LaPaille*, 786 F.Supp. 704 (N.D.Ill.1992) ("in addition to failing to prove a discriminatory effect for 14th and 15th Amendment purposes, the Gardner parties have also failed to prove a discriminatory motive as required under those amendments". *Id.* at 717.

 In the case at bar, the Defendants allege that the *Bonilla* Plaintiffs' constitutional challenge to the March 1992 Map fails to state a claim for two reasons: first, because the complaint allegedly fails to plead intentional discrimination; and second, because the claim is allegedly nothing more than an inappropriate claim for vote maximization. Defendants' arguments are misplaced.

In their complaint, the *Bonilla* Plaintiffs specifically allege that the March 1992 Map "intentionally deprives and abridges plaintiffs of the right to vote", P.2d.A.Comp., ¶ 67, in that "the defendants' are maintaining and perpetrating an unlawful redistricting map which intentionally and discriminatorily cancels out and dilutes the voting rights of the plaintiffs." P.2d.A.Comp., ¶ 65. This allegation not only notifies Defendants of the intentional discrimination claim against them, it also expressly identifies the claim's factual underpinning: in-

tentional, discriminatory dilution by means of the March 1992 Map.

Because this issue comes before the court in a motion to dismiss, the *Bonilla* Plaintiffs are free "to allege without evidentiary support any facts [they] please[ ] that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved ... would entitle [them] to judgment." *Early*, 959 F.2d at 79. Accordingly, the *Bonilla* Plaintiffs' allegation of intentional discrimination in violation of the 14th and 15th Amendments is sufficient to withstand a motion to dismiss.

 Meanwhile, the Defendants' argument that this is nothing more than a vote maximization claim is inappropriate at this stage of the litigation. This argument, which is analogous to a "totality of the circumstances" analysis under § 2(b) of the Voting Rights Act, is not supportable based upon the facts alleged in the complaint and the *Bonilla* Plaintiffs Response. Accordingly, the motion to dismiss count 3 is denied.

E. *The City Council is not a Suable Entity.*

 The capacity of a governmental entity to be sued in the federal courts is governed by state law. Fed.R.C.P. 17(b); Wright, Miller, & Kane, 6A *Federal Practice and Procedure:* Civil 2d § 1562 (West Publishing, 2d ed. 1990). As a result, "[a]lthough a municipal corporation and the individual members of its city council may have capacity to sue and be sued, the council itself may not be a legal entity for purposes of Rule 17(b)." Wright, Miller & Kane, *supra,* at § 1562, p. 454.

 In fact, absent a specific statutory authorization, a city council is not a suable entity. *Mayes v. Elrod*, 470 F.Supp. 1188, 1192 (N.D.Ill.1979) (Cook County Board of Commissioners is not a suable entity, even though by express statute, Cook County itself is); *Fairbanks v. Bradenton Beach*, 733 F.Supp. 1447, 1450 (M.D.Fla.1989) (City Council of Bradenton Beach, Florida is not a legal entity capable of being sued); *Latino Political Action Committee, Inc. v.*

*Boston,* 581 F.Supp. 478, 484 (D.Mass.1984) (City Council lacks legal identity apart from City of Boston and therefore is not a suable entity in redistricting challenge).

■■■ Although the Chicago City Council has been a defendant in prior redistricting litigation, the court is not aware of any case or statutory authority supporting a direct action against the Chicago City Council in this context.[9] Furthermore, both the Chicago Police Department and the Chicago Department of Streets and Sanitation have been found to lack a separate legal existence from the City, and have thus been held non-suable. *Jordan v. Chicago Dept. of Police,* 505 F.Supp. 1, 3–4 (N.D.Ill.1980); *Dr. Martin Luther King, Jr. Movement Inc. v. Chicago,* 435 F.Supp. 1289, 1294 (N.D.Ill.1977). Moreover, although the Illinois Cities and Villages Act does not specifically address the City Council's amenability to suit, it does provide that the Chicago Corporation Counsel is the legal adviser to both the City and the City Council:

> The head of the law department of the city shall be the corporation counsel. The corporation counsel shall be and act as the legal advisor of the city council and of the several officers, boards and departments of the city.

Ill.Rev.Stat. Ch. 24, ¶ 21–11. This provision strongly implies, at the very least, a commonality of legal interest between the City and the City Council. This is particularly true given that other statutorily mandated "clients" of the Corporation Counsel (i.e., the police and sanitation departments) were held to lack a separate legal identity from the City.

Accordingly, the court concludes, based upon the applicable statutory scheme, that the City Council is not a suable entity for purposes of the case at bar. The motion to dismiss the City Council as a defendant is therefore granted.

### F. *Paragraph (e) of the Prayer for Relief.*

In paragraph (e) of their prayer for relief, the *Bonilla* Plaintiffs make the following request:

> An order scheduling special election to be conducted after adoption of the map to be proposed by plaintiffs. In the alternative, if this Court does not find the current aldermanic map unconstitutional, plaintiffs request that this Court order special elections in the newly created Hispanic majority wards on the already scheduled November 3, 1992 election day, or on a date this Court may deem appropriate.

As discussed above, in *PACI,* the Seventh Circuit recently upheld the validity of the 1991 aldermanic elections, and expressly held that the aldermen elected in 1991 could serve their full four-year terms. *PACI,* 976 F.2d at 335. Moreover, this court, *supra,* dismissed count 2 of the Second Amended Complaint, in which the *Bonilla* Plaintiffs requested special elections to fill ward "vacancies". Accordingly, as a matter of law, the *Bonilla* Plaintiffs are not entitled to the relief requested in paragraph (e) of the prayer for relief. It is therefore stricken pursuant to F.R.C.P. 12(f) as an immaterial matter.[10]

### CONCLUSION

For all of the foregoing reasons, it is hereby ordered that: (1) the motion to dismiss count 1 of the Second Amended Complaint is granted in part and denied in part; (2) the motion to dismiss count 2 of the Second Amended Complaint is granted; (3) the motion to dismiss count 3 of the Second Amended Complaint is denied; (4) the motion to dismiss the City Council as a defen-

---

9. The court acknowledges that the Chicago City Council is amenable to suit under the Illinois Freedom of Information Act, Ill.Rev.Stat. ch. 116, ¶ 201 *et seq.* as well as the Illinois Open Meetings Act. Ill.Rev.Stat. ch. 102, ¶¶ 42.02, 42.-03, and 43. These express exceptions, which are of relatively narrow scope and impact, merely confirm that without such enactments, direct suit is unauthorized and improper.

10. Federal Rule of Civil Procedure 12(f) provides that "the court may order stricken from any pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

dant is granted; and (5) the motion to strike paragraph (e) of the prayer for relief is granted.